[No. A109057. First Dist., Div. One. Jan. 9, 2006.]

In re MICROSOFT I–V CASES.

## Counsel

Law Office of Charles Q. Jakob and Charles Q. Jakob for Objector and Appellant.

Townsend and Townsend and Crew, Eugene Crew, Margaret C. McHugh, Richard L. Grossman and Daniel J. Furniss for Plaintiffs and Respondents.

Heller Ehrman, Robert A. Rosenfeld, Jessica S. Pers, Russell P. Cohen and Scott E. Morgan for Defendant and Respondent.

OPINION

**MARCHIANO, P. J.**—Objector and appellant Charles Q. Jakob objected to the trial court's final approval of a billion-dollar settlement agreement reached in these consolidated class actions against defendant and respondent Microsoft Corporation (Microsoft). He contends that the court erred in rejecting his objections to the settlement agreement's provisions for a *cy près* distribution of unclaimed settlement funds, and therefore erred in its final judgment approving the settlement agreement. We affirm because the trial court did not abuse its discretion in determining the *cy près* provisions were fair, adequate and reasonable.

## Background

### A. *Proceedings Leading to the Settlement Agreement*

On February 18, 1999, plaintiff and respondent Charles Lingo initiated a class action suit against Microsoft in the San Francisco Superior Court. (*Lingo v. Microsoft* (Super. Ct. S.F. City and County, 2004, No. 301357) (*Lingo*).) In an amended complaint filed the following month, Lingo, joined by several other class representatives, sought injunctive relief and compensatory damages or restitution under the Cartwright Act (Bus. & Prof. Code, § 16720 et seq. (the Cartwright Act)) and the unfair competition law (Bus. & Prof. Code, § 17200 et seq.). The complaint alleged two classes. The first class was comprised of persons or entities who had indirectly acquired—through the purchase of computer hardware with preinstalled software—a license to use one of a number of versions of Microsoft operating system software, such as Windows or MS-DOS. This indirect acquisition of licenses allegedly began with purchases occurring on or after May 18, 1994. The second class consisted of those who had indirectly acquired licenses for compatible Microsoft application software-such as Word (word processing) or Excel (spreadsheet production)—on or after the same date.

The complaint alleged Microsoft had harmed the members of both classes through "exclusionary and restrictive practices" that resulted in software overcharges passed on to the class members and that these members had lost the benefits of competitive markets for software developed for both operating systems and applications.

Meanwhile, various state and federal antitrust actions against Microsoft had been consolidated before the federal district court in Washington, D.C. In November 1999, that court filed its findings of fact after a bench trial of those actions. Its concluding findings were that "Microsoft's . . . conduct . . . has demonstrated that it will use its prodigious market power and immense profits

to harm any firm that insists on pursuing initiatives that could intensify competition against one of Microsoft's core products . . . [and that its] past success in hurting such companies and stifling innovation deters investment in technologies and businesses that exhibit the potential to threaten Microsoft [with t]he ultimate result . . . that some innovations that would truly benefit consumers never occur for the sole reason that they do not coincide with Microsoft's self-interest." (*U.S. v. Microsoft Corp.* (1999) 84 F.Supp.2d 9, 112.)

These findings sparked the filing of numerous class actions against Microsoft in November 1999 and the ensuing months. Over 20 such actions were filed in California courts, and the Judicial Council ordered them and any "add-on cases," to be coordinated with *Lingo*, entitling the coordinated cases as the *Microsoft I–V Cases* (JCCP No. 4106).[1] (Cal. Rules of Court, rule 1550(c).) In March 2000, the trial court designated plaintiffs' counsel in *Lingo* to act as lead counsel for all plaintiffs in the *Microsoft I–V Cases*. (Cal. Rules of Court, rules 1540, 1541.) The above mentioned amended complaint in *Lingo* became the "operative complaint" in the coordinated actions.

In August 2000, the trial court certified the two classes alleged in the operative complaint. Initial efforts in 2001 to mediate or settle the *Microsoft I–V Cases*, initiated at the trial court's request, were unsuccessful. The parties resumed these efforts in 2002, and, in January 2003 announced they had reached a settlement. After five more months of negotiation, the parties executed a settlement agreement on June 16, 2003.

## B.   *The Settlement Agreement*

### 1.   *Vouchers for Direct Compensation to the Class*

The settlement agreement provides that "Microsoft shall make . . . Consumer Vouchers . . . available to all members of the California Class" pursuant to stated procedures. The "California Class" is defined to encompass generally the two classes certified in the *Microsoft I–V Cases*. That is, the settlement class includes "all persons or entities who, between February 18, 1995, and December 15, 2001, indirectly acquired a license for Microsoft Operating System and/or Microsoft Applications software for use in California."

---

[1] In April 2000, the federal judicial panel of multidistrict litigation similarly consolidated a number of such actions that had been brought or removed to various federal district courts, and assigned the consolidated cases to Chief Judge Frederick Motz of the District of Maryland. (See 28 U.S.C. § 1407.)

The consumer vouchers to be issued under this agreement approximate the agreed upon damages to be afforded to class members, as direct compensation for the alleged overcharges the class members incurred when they indirectly acquired licenses for the use of various types of Microsoft software. As the trial court stated, when it certified the classes alleged in the operative complaint, the "[t]otal classwide damages are the sum of the overcharges on all software programs sold to class members during the class period."

The consumer vouchers are divided into several categories of value. Thus, a class member who, within the defined time period, indirectly acquired one or more licenses for the use of various types of Microsoft operating system software in California is entitled to claim a voucher worth $16 for each such license acquisition. A class member who similarly acquired one or more user licenses for various versions of Microsoft application software is entitled to claim for each such acquisition a voucher worth $5, $26, or $29, the amount depending on whether the acquired license related to Word (word processing), Excel (spreadsheet production), or Office (bundled productivity applications) software.

A class member who indirectly purchased a license authorizing multiple installations of software is entitled to a voucher for each authorized use. For example, a member who acquired a license permitting a particular operating system or application software to be installed on as many as 100 computers is entitled to claim 100 vouchers for that category of software, even if the member actually installed the software on fewer than 100 computers.

A class member who properly claims and receives multiple vouchers is entitled to aggregate them, and also to transfer up to $650 of their total value. However, each voucher may be transferred only once and a transferee is entitled to redeem no more than $10,000 in transferred consumer vouchers.

A class member is entitled to obtain one or more vouchers by submitting a claim form to the settlement claims administrator. The claim form requires a sworn declaration as to information showing the quantity of each category of Microsoft user licenses acquired indirectly by the claimant during the appropriate time period. A member who is not a "volume licensee" may submit claims supported in this manner to show the acquisition of up to five licenses that would entitle the claimant to vouchers having a maximum value of $100. Additional claims by such a claimant must include additional evidence of acquisition, such as the license's product identification number, product key

number, or certificate of authenticity. A claimant may alternately request that Microsoft, under the administrator's supervision, conduct a search of certain of its own data bases for information that might document that claimant's application.

The period for submitting claims is defined as the period beginning with a commencement date, which was to be a date within 60 days of the court's order of preliminary approval, and ending on a date four months later, but not sooner than 30 days after entry of the court's final judgment.[2]

The settlement agreement provides that, once obtained, consumer vouchers are redeemable during the settlement period, which is defined as a four-year period beginning 60 days after final approval of the settlement agreement. To redeem these vouchers, a claimant or transferee is required to purchase—on a date after the settlement agreement's preliminary approval—some type of specified computer hardware or software. The hardware may include a computer using "any operating system platform." The software may include "title[s] not published by Microsoft." After such purchase, the claimant or transferee must submit proof of that purchase, together with one or more vouchers, to the settlement claims administrator, who is then required to reimburse the claimant or transferee with a payment equal to the value of the vouchers submitted. If the value of the submitted vouchers exceeds the proven purchase, the agreement provides "in principle" that the claimant or transferee may resubmit the vouchers with another purchase so as to redeem their entire value, pursuant to procedures to be agreed upon with the settlement claims administrator.

## 2. *The* Cy Près *Distribution*

The settlement agreement provides for "a form of cy près remedy, which [is to] be available to Eligible Schools." The stated purpose of this "cy près program is to benefit public schools in California at which a substantial percentage of the attending students come from low-income households." "Eligible Schools" are thus defined in the settlement agreement as "all public elementary, middle, junior high and high schools (K-12) in California at which at least 40 percent of the attending students are eligible to receive free

---

[2] The agreement's notice of settlement provisions, among other things, obligates Microsoft to pay for the costs of notice, subject to a limit of $270,000 for published notice in print and electronic media. The provisions also provide for both written and electronically mailed notices to addressees obtained from Microsoft data bases and other sources, and provide for posting on an Internet Web site maintained by the settlement claims administrator. Microsoft is obligated to pay up to $30,000 "to allow the Settlement Claims Administrator to utilize . . . reasonable means to obtain corrected addresses" other than the change of address service of the United States Postal Service.

or reduced price meals through the National School Lunch Program . . . [and] public high schools in California that serve students from public elementary, middle and junior high schools in California at which at least 40 percent of the attending students are eligible to receive free or reduced price meals through the National School Lunch Program."[3]

The terms for the *cy près* distribution provide that, in the event that the $1.1 billion face value amount of the settlement is not exhausted by the issuance of consumer vouchers to class members, then the remaining, unclaimed portion of that face value amount is to be apportioned. One-third of the unclaimed portion is to be "retained" by Microsoft. Two-thirds of the unclaimed portion is to be "designated as the 'First cy près Amount.' " Microsoft is obligated to issue vouchers equal in value to this "First cy près Amount." Half of these vouchers are to be "General Purpose Vouchers" and the other half are to be "Software Vouchers."

The terms also provide for the possibility that not all consumer vouchers issued to class member claimants will be redeemed within the applicable four-year period. In this event, one-third of the total value of these unredeemed consumer vouchers is to be "retained" by Microsoft. The other two-thirds is to be designated as the "Second cy près Amount." Microsoft is obligated to issue vouchers equal in value to the "Second cy près Amount," again with half the vouchers designated "General Purpose Vouchers" and the other half designated "Software Vouchers."

The process by which eligible schools or school districts serving such schools may apply for and obtain either general purpose or software vouchers requires the development and implementation of "State-approved . . . technology plan[s]." Microsoft is obligated to distribute the vouchers directly to eligible schools, school districts serving eligible schools, or the California Department of Education (Department), in a manner to be agreed upon by the Department, the settlement claims administrator, and counsel for both plaintiffs and Microsoft, to ensure a "platform neutral distribution" for uses "consistent with State Academic Content Standards and effective integration of technology."[4]

---

[3] Income eligibility guidelines for the National School Lunch Program are calculated annually. Children eligible for free or reduced price lunches are generally those living in households with an income no greater than 130 or 185 percent, respectively, of the nonfarm poverty guidelines prescribed by the Office of Management and Budget, as adjusted by specified reference to the official poverty line and the most recent change in the Consumer Price Index. (42 U.S.C. § 1758(b)(1).) Children of households receiving assistance under the federal food stamp program or receiving other forms of aid may also be certified as eligible on that basis. (42 U.S.C. § 1758(b).)

[4] Of the total amount to be dedicated to vouchers under the *cy près* program, the Department is authorized to use up $550,000 for expenses in administering the program. It is not, however,

Once distributed, eligible schools may redeem the vouchers within a six-year period. They may redeem general purpose vouchers for either qualifying computer hardware, software compatible with such hardware, services directed either towards the maintenance of such hardware or software, or towards professional training in the academic use of this technology. They may redeem software vouchers to obtain various types of Microsoft software, or, alternately, software products issued by other companies that either compete with such Microsoft software or are "substantially similar" in function to such software.

If there are general purpose or software vouchers that remain undistributed or unused at the end of the six-year redemption period, Microsoft and plaintiffs' lead counsel are to agree either to extend that period, or alternately to offer the remaining value of the unused vouchers to "other needy organizations in California, to be jointly selected (with court approval)."[5]

## C. *Postsettlement Trial Proceedings*

On July 18, 2003, following a motion by plaintiffs' lead counsel, the trial court entered an order granting preliminary approval of the settlement agreement. This order also set a date for a final approval hearing. (Cal. Rules of Court, rule 1859(a), (c), (e).)

The notice provisions of the settlement agreement set out a procedure whereby "[a]ny member of the California Class" might appear at the final approval hearing "to present any objections to the Settlement . . . or to present any opposition to the request for attorneys' fees and costs submitted by Lead Counsel . . . ." A member wishing to appear was required to file and serve a written objection by the deadline set by the court. In response to the published and mailed notices of the class settlement, some 334 communications were received on or before the set deadline of December 30, 2003. These included a written objection by Jakob. Jakob was also among the objectors who appeared and spoke on March 29, 2004, the first day of the final approval hearing. (See Cal. Rules of Court, rule 1859(e), (g).) The final approval hearing, which included hearing on the issue of attorney's fees as well the fairness of the settlement, continued for six days, concluding on April 8, 2004.

---

required to assume any fiscal or auditing responsibility and need not guarantee appropriate use of the vouchers by the eligible schools that ultimately receive them.

[5] The terms of the settlement agreement, in addition to the provisions for direct compensation of class members and the *cy près* program, include a release by class members of claims against Microsoft and Microsoft's express nonadmission of the truth of any of the class plaintiffs' claims or allegations. The nonadmission provision is discussed further, *post.*

On July 26, 2004, the trial court filed a statement of decision in which it concluded that "[t]he terms of the Settlement [were] fair, reasonable and adequate." The court filed its final judgment on November 9, 2004, in which it awarded fees, dismissed the coordinated cases, and ordered its continuing jurisdiction to enforce the terms of the settlement. (See Cal. Rules of Court, rule 1859(h).) This appeal followed.[6]

## Discussion

### A. *Introduction*

█ Jakob's appeal centers upon the settlement agreement's "cy près program."[7] The doctrine of *cy près*[8] originated in the early English courts of equity with respect to charitable trusts. When compliance with the terms of such a trust became impossible, the court would put the trust funds to "the next best use" consistent with the donor's dominant charitable intent. (*In re Vitamin Cases* (2003) 107 Cal.App.4th 820, 826 [132 Cal.Rptr.2d 425] (*Vitamin Cases*).) "In the class action context, the *cy près* doctrine is generally denominated 'fluid recovery.' " (*State of California v. Levi Strauss & Co.* (1986) 41 Cal.3d 460, 472 [224 Cal.Rptr. 605, 715 P.2d 564] (*Levi Strauss*).) Under the latter doctrine, when it is not possible or practicable in a class action judgment to compensate class members according to their respective damages, the best alternative for the court is to award damages in a way that benefits as many of the class members as possible, despite the probability that some class members will not benefit whereas some nonmembers will. (*Vitamin Cases, supra*, 107 Cal.App.4th at p. 826.)

---

[6] On March 4, 2005, this court ordered the appeal to be consolidated with a number of others brought by other objectors. By October 2005, however, all the other appeals had been voluntarily dismissed.

[7] In reviewing the merits of Jakob's appeal, we necessarily reject the contention, raised by plaintiffs and respondents' lead counsel, that Jakob lacks standing. This claim is grounded on Jakob's failure to present sufficient evidence below of his status as a class member. Jakob, however, asserted a factual basis for his status as a class member in his written objection. Respondents made no objection at the final approval hearing on the ground that this statement was not presented in a form admissible as evidence. Nor did the notice of class settlement state that such formal proof of class membership was required either to submit a written objection or to appear at the hearing. Respondents raised this issue for the first time in their responding brief. Under these circumstances, we deem that respondents have waived any objection to the admissibility or sufficiency of the factual statement in Jakob's written objection. As such, the record contains evidence of his standing to appeal. (Cf. *Wershba v. Apple Computer, Inc.* (2001) 91 Cal.App.4th 224, 236 [110 Cal.Rptr.2d 145] (*Wershba*); see also *van't Rood v. County of Santa Clara* (2003) 113 Cal.App.4th 549, 560 [6 Cal.Rptr.3d 746] [appellate standing should be liberally construed, with doubts resolved in favor of the right to appeal].)

[8] *Cy près* derives from the Norman French *cy près comme possible*, literally, "as near as possible." (See Note, *The Consumer Trust Fund: A Cy Près Solution to Undistributed Funds in Consumer Class Actions* (1987) 38 Hastings L.J. 729, 730.)

## B. *Code of Civil Procedure Section 384 (section 384)*

Jakob cites to section 384, subdivision (b), which in relevant part provides that "prior to the entry of any judgment in a class action . . . the court shall determine the total amount that will be payable to all class members [and] shall also set a date when the parties shall report to the court the total amount that was actually paid to the class members. After the report is received, the court shall amend the judgment to direct the defendant to pay the sum of the unpaid residue, plus interest . . . to nonprofit organizations or foundations to support projects that will benefit the class or similarly situated persons, or that promote the law consistent with the objectives and purposes of the underlying cause of action, to child advocacy programs, or to nonprofit organizations providing civil legal services to the indigent."

Jakob claims this provision "flatly prohibits" a *cy près* distribution such as the one set out in the settlement agreement. He emphasizes its use of the phrase "any judgment in a class action," as well as the absence in this section of any language that would provide an exception[9] for a judgment such as one in this case—that is, a judgment approving a settlement agreement having its own provisions for a *cy près* distribution. Thus, Jakob reasons that section 384, subdivision· (b) requires a trial court in *all* class actions to order the distribution of any unclaimed residue to one or more of the entities specified in that subdivision. These entities do not include the public, eligible schools that are designated as the residual beneficiaries under the terms of the *cy près* distribution set out in the settlement agreement.[10] Jakob urges that the trial court consequently "disobey[ed] [the] plain meaning" of section 384, subdivision (b) when it approved the settlement agreement.

The trial court considered and rejected this objection. Citing *Vitamin Cases, supra*, 107 Cal.App.4th at pages 828–829, the court concluded that section 384 "provide[d] for distribution of unpaid residuals . . . only when the parties have not made other provisions for those funds."

---

[9] There is an express exception, for example, for judgments against certain public entities or employees. (§ 384, subd. (c).)

[10] Jakob also contends that section 384, subdivision (b) precluded approval of the settlement agreement because the entities specified to receive "unpaid residue" in that subdivision do not include class action defendants, yet the *cy près* provisions of the settlement agreement permit Microsoft to retain one-third of the value of unclaimed or unredeemed consumer vouchers. It does not appear, however, that Jakob effectively stated this objection below, either in his written objection or in his argument at the final approval hearing. Moreover, while his opening brief contains critical allusions to this aspect of the settlement agreement, Jakob's first clear expression of this contention occurs only in his reply brief. This court need not consider the merits of a claim involving a question of law that is articulated for the first time in a reply brief. (See *Save The Sunset Strip Coalition v. City of West Hollywood* (2001) 87 Cal.App.4th 1172, 1181, fn. 3 [105 Cal.Rptr.2d 172].) We conclude, in any event, that the contention has no merit given our construction of section 384, subdivision (b), discussed *post*.

Jakob argues the trial court erred in relying on *Vitamin Cases* for such a proposition. The portion of that opinion on which the trial court relied was, in his view, mere dictum. He also suggests that, in expressing this dictum, the reviewing court in *Vitamin Cases* misconstrued section 384 after improperly resorting to legislative history. Because the Legislature's intent in enacting section 384 is expressly set out in section 384, subdivision (a), Jakob urges it is unnecessary, and improper, to examine legislative history to determine such intent.

■   Whether or not section 384, subdivision (b) properly applies to preclude approval of the settlement agreement in this case is a question of statutory interpretation that we review independently. (*Vitamin Cases, supra,* 107 Cal.App.4th at p. 826.) The ultimate purpose of all statutory construction is to determine and give effect to the legislative intent. Because the statutory language itself is the most reliable indicator of that intent, we begin by examining that language, giving its terms their usual and ordinary meaning and construing them in context. (*People v. Robles* (2000) 23 Cal.4th 1106, 1111 [99 Cal.Rptr.2d 120, 5 P.3d 176] (*Robles*).)

■   Viewing section 384, subdivision (b) in this fashion, we conclude that the phrase "any judgment" in that subdivision cannot reasonably be construed as Jakob urges—that is, it cannot mean *every* judgment or *all* judgments entered in a class action. While such a construction could be consistent with the ordinary meaning of the word "any," the phrase must be construed in its context, and such a construction would *not* be consistent with the procedure set out in subdivision (b). This procedure calls for the trial court to determine the total amount to be paid to class members before it enters the judgment, to set a future date for the parties to report back to the court regarding the total amount actually paid, and then to amend the judgment in order to make a distribution of the "unpaid residue" to one or more specified entities. Thus, the procedure necessarily excludes any judgment that is not in favor of the class plaintiffs, as well as any judgment that *is* in favor of class plaintiffs, but does not provide for any direct compensation of class members and hence does not require a distribution of "unpaid residue." (See, e.g., *Vitamin Cases, supra,* 107 Cal.App.4th at p. 826.) The procedure also necessarily excludes a judgment, such as the one in this case, which approves and undertakes to monitor the execution of a settlement agreement that itself provides for the distribution of any unclaimed portion of the compensation awarded directly to class members. In this case there is no need for a procedure to *amend* the judgment in order to distribute the unclaimed portion of direct compensation.

The interpretation given to section 384, subdivision (b), by Division Two of this court in *Vitamin Cases*, is fully consistent with this construction. In that case, the entire proposed settlement fund was to be distributed to charitable, governmental, and nonprofit organizations. Objectors to the settlement argued that section 384 precluded approval because the agreement failed to provide for any direct compensation to class members. (*Vitamin Cases, supra*, 107 Cal.App.4th at p. 826.) The reviewing court held that section 384, subdivision (b) did not preclude approval of the agreement. (*Vitamin Cases, supra*, at p. 832.) It construed the language of section 384, subdivision (b) to provide a procedure for distributing "unpaid residue," a procedure that assumed—but did not necessarily require—some form of award of direct compensation. *Vitamin Cases* involved no direct compensation and hence no possible unpaid residue. As such, the statute's "assumption [was] incorrect" and "the procedures of section 384, subdivision (b), [were] inapplicable." (*Vitamin Cases, supra*, at p. 827.) In effect, the court in *Vitamin Cases* construed the phrase "any judgment" not in the broad sense that Jakob advocates, but in the context of a procedure for distributing "unpaid residue," and concluded that this phrase did not include a judgment in favor of the class plaintiffs in which there could be no unpaid residue requiring distribution.

■ The legislative history of section 384 is also consistent with our construction. Even when a statute is unambiguous, it is nevertheless common for a court to review legislative history in order to confirm its statutory analysis. (*SFPP v. Burlington Northern & Santa Fe Ry. Co.* (2004) 121 Cal.App.4th 452, 470 [17 Cal.Rptr.3d 96].) Here, by contrast, there is an inherent ambiguity, in that section 384, subdivision (b) refers to "any judgment [entered] in a class action," but provides a procedure that is necessarily limited to range of judgments narrower than the commonly understood meaning of that phrase. Contrary to Jakob's assertion, this ambiguity is not resolved by the express declaration of legislative intent set out in section 384, subdivision (a).[11] Thus, it is proper to examine the legislative history of section 384 to determine the proper scope of the phrase "any judgment." (*Robles, supra*, 23 Cal.4th at p. 1111; *Kraus v. Trinity Management Services, Inc.* (2000) 23 Cal.4th 116, 129 [96 Cal.Rptr.2d 485, 999 P.2d 718].)

■ Contemporaneous legislative committee analyses are subject to judicial notice. (*In re J. W.* (2002) 29 Cal.4th 200, 211 [126 Cal.Rptr.2d 897, 57 P.3d 363].) We may also regard them as reliable indicia of the legislative

---

[11] Section 384, subdivision (a), provides in relevant part that "[i]t is the intent of the Legislature in enacting this section to ensure that the unpaid residuals in class action litigation are distributed, to the extent possible, in a manner designed either to further the purposes of the underlying causes of action, or to promote justice for all Californians." This expression of general intent sheds no light on the meaning of "any judgment" in section 384, subdivision (b), and as discussed further *post*, does not compel an interpretation of that phrase that would include the judgment in this case.

intent underlying the enacted statute. (*Altaville Drug Store, Inc. v. Employment Development Department* (1988) 44 Cal.3d 231, 238 [242 Cal.Rptr. 732, 746 P.2d 871].) We find particularly instructive a Senate Floor analysis prepared by the Senate Rules Committee for introduction of the 1993 bill that led to the initial enactment of the statute that has since been renumbered as section 384. (Sen. Rules Com., Off. of Sen. Floor Analyses, Rep. on Sen. Bill No. 536 (1993–1994 Reg. Sess.) as introduced. (Senate Floor analysis).) In its background summary, this analysis explained that there was "often" an "unclaimed balance of the total class recovery ('residue') . . . either because the claimants cannot be located or . . . choose not to collect the award . . . ." "Sometime[s], attorneys, *subject to court approval,* will have flexibility in determining who will recover the residue (the defendant, the known claimants, or some other entity who will use the funds for the benefit of the non-claiming class). *When the agreement is silent on the distribution of the remaining funds, the court makes the decision.*" (Sen. Floor analysis, *supra,* at p. 2, italics added.) The analysis thus clearly indicated that the procedure in section 384, subdivision (b) was initially designed to guide trial courts in a specific eventuality, that is, in the event a settlement agreement is "silent" as to "the distribution of the remaining funds" and the court must therefore "make[] the decision" as to such distribution.[12] (Sen. Floor analysis, *supra,* at p. 3.)

One significant concern expressed in the same Senate Floor analysis was that "a defendant [might] argue that any unclaimed class action funds must be returned . . . ." (Sen. Floor analysis, *supra,* at p. 3.) The analysis explained that "*unless there is a court approved settlement which provides for reversion of remaining funds to the defendant* . . . the general rule is that defendants do not have a . . . right to recover the funds once they have deposited the funds into an escrow account." (*Ibid.,* italics added.) With regard to this concern the analysis concluded that "[r]ather than allowing [the unclaimed residue] to revert to the defendant, this bill would require the Court to distribute the residual in a manner consistent with the action or to remit the funds to the fund named in the legislation." (*Ibid.*) Here, too, the analysis showed an intent to establish a procedure to protect the class members' interest in any

---

[12] The procedure, at the time the bill was initially introduced, is described in the analysis as one requiring the court "to distribute the residual in a manner consistent with the [class] action or to remit the funds to the fund named in the legislation." (Sen. Floor analysis, *supra,* at p. 3.) The "named" fund was for the California Legal Corps, an agency to be created by the State Bar which would "conduct preventive law and pro per clinics, community legal education activities, promote the use of alternative dispute resolution, assist victims of disasters with legal services and otherwise promote access to the legal system." (Sen. Floor analysis, *supra,* at p. 2.) As ultimately enacted in 1993, the statute provided that a trial court was to order a distribution of unpaid residue "in any manner [it] determine[d] [was] consistent with the objectives and purposes of the underlying cause of action," but that this could include a distribution either to the California Legal Corps or to "child advocacy programs." (See Stats. 1993, ch. 863, § 2, p. 4574.) The current procedure set out in section 384 is largely the result of an amendment enacted in 2001. (See Stats. 2001, ch. 96, § 2.)

unpaid residue, but also a recognition that such protection was necessary only when there was no "court approved settlement." The analysis additionally recognized that a court approved settlement could properly include a "reversion of . . . funds to the defendant," such as the one-third reversion provided in the settlement agreement in this case. (*Ibid.*)

The reviewing court in *Vitamin Cases* considered this same Senate Floor analysis, finding that it "underscore[d]" the statute's focus on distribution of residue. (*Vitamin Cases, supra,* 107 Cal.App.4th at p. 828, citing Sen. Floor analysis.) The court noted that class members are generally entitled to a notice that fairly apprises them of their options either to accept a proposed award or to object or opt out. (*Vitamin Cases, supra,* at p. 828, citing *Trotsky v. Los Angeles Fed. Sav. & Loan Assn.* (1975) 48 Cal.App.3d 134, 151–152 [121 Cal.Rptr. 637].) It observed that this right is compromised when a "settlement agreement or judgment does not describe the intended disposition of the residue," because the class members cannot later object to any eventual distribution method the court may be called upon to adopt in order to dispose of an unpaid residue. (*Vitamin Cases, supra,* at p. 829.) We note such an observation echoes the intent expressed in the analysis, to prevent a subsequent reversion of residue to a defendant when that reversion was not a part of the settlement terms that were previously scrutinized during the approval process. The court in *Vitamin Cases* concluded it was "manifest" that the procedure set out in section 384 was designed to protect the right of class members in such an eventuality, "by requiring . . . the court [to] ensure that the residue is directed to an appropriate nonprofit organization or foundation." (*Vitamin Cases, supra,* at pp. 828–829.) That court also concluded that the class members in the case before it did "not need the judicial protection provided by section 384," because the settlement agreement in that case did "not produce a residue whose distribution was not explained to [them]," and they were otherwise "fully informed of the nature of the intended distribution and [were] afforded an opportunity to opt out or object." (*Vitamin Cases, supra,* at p. 829.) We find these conclusions also to be consistent with our interpretation.[13]

---

[13] Jakob argues the trial court's "view of Section 384 [was] also invalid" because the notice of the class settlement was inaccurate concerning the proposed distribution and implied that the court had already "rigorously scrutinized the distribution and determined it to be the next best alternative." This argument suggests that, unlike the class in *Vitamin Cases*, the protection of section 384, subdivision (b) was needed in this case because class members were not given notice that "fully informed [them] of the nature of the intended distribution and afforded [them] an opportunity to opt out or object." (*Vitamin Cases, supra,* 107 Cal.App.4th at p. 829.) The notice of settlement to which Jakob refers, however, does not support such a view. It not only summarized the intended distribution and detailed the class members' option to object, but also provided both a toll free number to obtain answers to any questions and an address to an Internet Web site at which class members could obtain more detailed information and view the settlement agreement in its entirety. We find nothing either in this notice or the settlement

■ Finally, we note that the legislative intent set out in section 384, subdivision (a) is consistent with our interpretation. Subdivision (a) expresses an intent in enacting section 384 "to ensure that the unpaid residuals in class action litigation are distributed, to the extent possible, in a manner designed either to further the purposes of the underlying causes of action, or to promote justice for all Californians." Under our interpretation, the procedure of section 384, subdivision (b) does not apply to a judgment approving a settlement agreement that includes its own provisions for distribution of any unpaid residue. However, as discussed *post*, in such a case the trial court must scrutinize the agreement and approve it only after determining that it is fair, adequate, and reasonable. (See *Dunk v. Ford Motor Co.* (1996) 48 Cal.App.4th 1794, 1801 [56 Cal.Rptr.2d 483] (*Dunk*); see also Cal. Rules of Court, rule 1859(g).) In making this determination it must further consider whether the proposed *cy près* distribution is useful in fulfilling the purposes of the underlying cause of action. (See *Levi Strauss, supra,* 41 Cal.3d at p. 472.) Thus, the court approval process conforms to the intent of section 384, subdivision (a) by ensuring that "unpaid residuals . . . are distributed . . . in a manner designed . . . to further the purposes of the underlying cause[] of action . . . ."

■ In sum, we conclude that the phrase "any judgment" in section 384, subdivision (b) is limited by its context to refer to a judgment that awards some form of direct compensation to plaintiff class members, yet requires subsequent amendment because it does not itself provide for the calculation and distribution of any unpaid residue of the direct compensation. The trial court did not err when it refused to apply section 384 to the judgment in this case.

## C. *Abuse of Discretion*

### 1. *Standard of Review*

Jakob contends the court erred in approving the settlement agreement's proposed *cy près* distribution regardless of section 384.

---

agreement implying that the trial court had given its imprimatur to the agreement's *cy près* distribution. The notice specifically stated that that court had "granted preliminary approval of the settlement but still ha[d] to decide whether to grant final approval." We do not agree that the mere use in the settlement agreement of the phrase "*cy près*" is misleading to class members because the term "actually [refers to] an equitable determination." As we have noted, the expression "*cy près*" refers to a "doctrine [that] originated in the charitable trust field when courts took steps to prevent the failure of trusts." (4 Conte & Newberg, Newberg on Class Actions (4th ed. 2002) Settlement of Class Actions, § 11:20, p. 28 (Conte & Newberg).) While it may refer to principles developed by earlier court decisions, this term is nevertheless understood to denote a *doctrine* rather than a judicial act.

■ A trial court must approve a class action settlement agreement and may do so only after determining it is fair, adequate, and reasonable. (*Dunk, supra,* 48 Cal.App.4th at pp. 1800–1801.) It is vested with a broad discretion in making this determination. (*Id* at p. 1801.) In exercising its discretion, that court should consider relevant factors, which may include, but are not limited to the strength of the plaintiffs' case, the risk, expense, complexity and duration of further litigation as a class action, the amount offered in settlement, the extent of discovery completed and the stage of the proceedings, the experience and views of counsel, the presence of a governmental participant, and the reaction of class members to the proposed settlement. At the same time, the trial court should give "[d]ue regard . . . to what is otherwise a private consensual agreement between the parties."[14] (*Ibid.*) Such regard limits its inquiry " 'to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned.' " (*Dunk, supra,* at pp. 1800–1801, citing *Officers for Justice v. Civil Service Com'n, etc.* (9th Cir. 1982) 688 F.2d 615, 625 (*Officers for Justice*).) The trial court operates under a presumption of fairness when the settlement is the result of arm's-length negotiation, investigation and discovery that are sufficient to permit counsel and the court to act intelligently, counsel are experienced in similar litigation, and the percentage of objectors is small. (*Dunk, supra,* at p. 1802.) Ultimately, the court's determination is simply " ' "an amalgam of delicate balancing, gross approximations and rough justice." ' " (*Dunk, supra,* at p. 1801, citing *Officers for Justice, supra,* 688 F.2d at p. 625.)

Our task is limited to a review of the record to determine whether it discloses a clear abuse of discretion when the trial court's determination of fairness is challenged on appeal. We do not substitute our notions of fairness for those of the trial court or the parties to the agreement. (*Dunk, supra,* 48 Cal.App.4th at p. 1802.) "To merit reversal, both an abuse of discretion by the trial court must be 'clear' and the demonstration of it on appeal 'strong.' " (*7-Eleven Owners for Fair Franchising v. Southland Corp.* (2000) 85 Cal.App.4th 1135, 1146 [102 Cal.Rptr.2d 777] (*7-Eleven*).)

### 2. *Failure to Consider Alternative* Cy Près *Distributions*

Jakob's arguments concerning the trial court's abuse of discretion include an extensive use of rhetorical embellishment and allusion to matters outside the record. Once stripped of this varnish, they may be reduced to two

---

[14] Public policy generally favors the compromise of complex class action litigation. (See 4 Conte & Newberg, *supra,* § 11:41, pp. 87–88.)

arguments. The first argument is that the court abused its discretion by failing to exercise it. Specifically, it did not require the parties to provide information concerning possible alternate distributions, nor did it inquire independently into such possible alternate distributions, for example, by ordering a referee's report. Because the court never compared the proposed *cy près* distribution with possible alternate distributions, Jakob reasons that it was unable to "make a reasoned decision" as to whether the proposed distribution was the " '[b]est' option[]."

■ The trial court was not called upon to fashion a *cy près* distribution of residue, but rather it was called upon to approve a distribution the parties fashioned through extensive negotiated compromise. Jakob has cited no authority that explicitly imposes on the trial court a duty to compare a settlement agreement's proposed *cy près* distribution with other possible distributions when assessing the fairness of that agreement. The Supreme Court has stated that "trial courts should have the full range of alternatives at their disposal" when selecting an appropriate method of fluid recovery in a given case. (*Levi Strauss, supra,* 41 Cal.3d at p. 479.) However, the Supreme Court made this statement in the context of providing general guidance to trial courts "confronting the largely uncharted area of fluid recovery in consumer class actions." (*Ibid.*) To construe this statement to *require* a trial court to investigate other possible alternates whenever it examines a *cy près* distribution included in a settlement agreement would improperly require that court to conduct an inquiry inconsistent with its duty to give the agreement of the parties "[d]ue regard" and limit its inquiry to a determination whether that agreement, *as proposed,* was not a product of fraud or collusion and was, on the whole, fair. (*Dunk, supra,* 48 Cal.App.4th at p. 1801.) The court's proper focus in this context is not so much whether another type of distribution might be better, but the extent to which the distribution, *as proposed,* is appropriately useful in fulfilling the purposes of the underlying cause of action. (*Levi Strauss, supra,* at p. 472.) Certainly the trial court *may* consider whether another distribution would be more useful in fulfilling this purpose, particularly when an alternate distribution is proposed by a class member objecting to the settlement agreement. The appealing objector did just that in *Levi Strauss.*[15] (See *Levi Strauss, supra,* at pp. 464–465, 475–476 [arguing

---

[15] In contrast to the objector in *Levi Strauss,* Jakob did not, either in his written objection or at the final approval hearing, request that the trial court consider any alternate *cy près* distribution on the ground that it would better serve the purposes of the underlying cause of action than the distribution proposed by the parties. Nor does it appear that the trial court refused to consider any alternate distribution proposed by another objector. Jakob cites to a statement made by the court during the final approval hearing, to the effect that it was "not sure [it] need[ed] somebody [other than counsel for the parties] pointing to . . . other information," and suggests that this comment is indicative both of the court's predisposition to grant its approval and its unwillingness to consider additional information offered by objectors. This comment occurred during an exchange between the trial court and counsel for another

that a consumer trust fund was preferable to the proposed distribution using the "claimant fund sharing" method].) We note that neither objector Jakob nor anyone else presented a specific alternative *cy près* proposal. In any event, we conclude that a trial court is not required to initiate an investigation to determine other possible *cy près* distributions when it conducts a reasonable assessment of a *cy près* distribution proposed in a settlement agreement. The trial court here did not abuse its discretion by failing to conduct such an investigation.

### 3. *The Proposed* Cy Près *Distribution's Relation to the Class Action*

In its statement of decision, the trial court concluded the proposed *cy près* distribution was "a valuable portion of the Settlement, and an appropriate and beneficial use of the Settlement benefits that are not claimed by class members."

Jakob's second argument regarding abuse of discretion relates to this conclusion. He argues the trial court abused its discretion in making this determination because the proposed *cy près* distribution does not serve the purposes of the underlying cause of action. That is, it does not "serve the goals of deterrence or compensation." Jakob asserts the proposed distribution has no compensatory effect because it is a "spillover" of benefits to nonclass members—eligible schools and the students they serve do not, in his view, have any correlation with the plaintiff class of individuals and businesses that were overcharged in their indirect acquisition of Microsoft user licenses. He challenges as "speculative" and "without foundation" the trial court's express findings that the proposed *cy près* distribution would benefit class members. Jakob also insists the proposed distribution has no deterrent effect because it includes a one-third reversion and requires Microsoft to do no more than "giv[e] away" the two-thirds remainder in the form of vouchers. Such a distribution will require only "negligible" costs on Microsoft's part, and will operate as a marketing device that will ultimately benefit Microsoft by expanding its customer base of software users.

---

class member. Counsel sought to introduce additional evidence concerning the class action's litigation value—through what he described as "a request, not an objection." When the court asked counsel if it had any bearing "on something [he] want[ed] to present as an objection," counsel replied, in effect, that "the record has to be complete." The court then stated that the parties had provided sufficient information on "that issue" and it was "not sure [it] need[ed] somebody else pointing to some other information." We see nothing in this colloquy that shows the court failed to consider a proposed alternate *cy près* distribution. Nor does it otherwise indicate the court was unwilling to consider objections generally. In our view, it merely indicates the court's intention during that portion of the hearing devoted to the arguments of objectors, to curtail argument or comment not clearly characterized as an objection.

We note initially that the trial court's statement of decision indicates that it considered the proper criteria for determining whether the settlement agreement was overall fair, adequate and reasonable. (See *Dunk, supra,* 48 Cal.App.4th at p. 1801.) As discussed further *post,* it also appears the court considered the proper criteria for determining more specifically the appropriateness of the proposed *cy près* distribution—that is, whether the distribution was useful in fulfilling the purposes of the underlying cause of action. (*Levi Strauss, supra,* 41 Cal.3d at p. 472.) As the underlying cause of action rested principally on alleged violations of the Cartwright Act, those purposes were twofold, as Jakob suggests: compensation of injured class members and deterrence or disgorgement. (*Levi Strauss, supra,* 41 Cal.3d at p. 472.)

Hence, if the trial court erred in determining that the proposed *cy près* distribution was an appropriate part of an otherwise fair settlement agreement, this was not the result of its applying erroneous legal criteria or assumptions. In reviewing Jakob's contention, we do not examine the evidence submitted to determine, in the first instance, whether the proposed distribution is appropriate. We simply review the record to determine whether the court acted within its discretion. (*Wershba, supra,* 91 Cal.App.4th at p. 235.)

With respect to the compensatory effect of the proposed *cy près* distribution, the trial court found "that providing vouchers for computer equipment, software and a variety of other technical and educational services to California public schools serving students from low income households benefits the Class by insuring that a new generation of computer literate children will enter the work force fully trained to make the best use of computer technology. The California Department of Education estimates that the *cy près* program will benefit 5,112 public schools in California serving 3.6 million students. The *cy près* program addresses an important educational need in California that will indirectly benefit the entire Class. Class members also may benefit indirectly through a reduced tax burden to fund technology investment in eligible schools."

We do not deem these findings to be so "speculative" or "without foundation" to constitute an abuse of discretion. A letter prepared by the State Superintendent of Public Instruction supports the finding that the distribution will, in fact, benefit the specified numbers of schools and students. A declaration prepared by an expert in educational technology also provides support for the finding that the distribution will benefit eligible schools and the students they serve. The latter declaration, in addition, provides support

for the finding that class members will derive indirect benefit from such assistance to students, because it contributes to a "new generation" that will be "computer literate" when they enter the workforce. This declaration describes state educational policy that supports further development of technology in schools in order to improve the "productivity of our future workforce," and declares that the "private sector" has a "particular interest" in this productivity, and that the population overall shares that interest because of the correlation between productivity and quality of life. It is reasonable to infer from these statements that direct benefit to eligible schools will result in some indirect benefit both to California businesses or organizations that use or rely on computer technology, and also to state residents overall. It is also reasonable to infer a significant overlap between class members and these businesses, organizations, and residents. Finally, the declaration of an expert in computer science provides support for the conclusion that class members may "benefit indirectly through a reduced tax burden." We conclude that the court acted within its discretion in determining that the proposed distribution was useful in furthering the purpose of the law underlying the plaintiffs' cause of action in that it provided an indirect compensatory effect.

The fact that the compensatory effect for class members was *indirect,* as compared with the more direct benefit to low-income students having little correlation with the plaintiff class, does not alter this conclusion. The parties in this case came to a settlement designed to provide direct compensation to individual class members in the first instance. There was evidence that the notice of settlement had reached at least 80 percent of the estimated 14.7 million class members. These notices and the agreement itself detailed a relatively easy claims and proof procedure by which class members would obtain such direct compensation. The agreement included a component for initial direct compensation that had the potential to exhaust the entire settlement fund. Under these circumstances we see no clear abuse of discretion in approving a second, *cy près* distribution that placed much less emphasis on the compensation of class members, particularly in that the latter distribution furthered another purpose of the Cartwright Act.

That other purpose, as noted, is deterrence or disgorgement. With regard to this purpose the trial court found, preliminarily, that the total amount of settlement benefits, valued at $1.1 billion, was equal to "nearly half of plaintiffs' median Cartwright Act damage claim . . . and nearly five times the damage calculations of Microsoft's experts, even without discounting these

damage calculations . . . to take into account the risks of loss in complex litigation such as this." The court determined this was "fair, reasonable and adequate compensation to the Class," given it had "reasonably . . . elected to secure [these] substantial and certain benefits . . . in lieu of the risk, uncertainty, and delay inherent in ongoing litigation . . . ." Jakob does not dispute this determination.

More to the point, the court then determined that the *cy près* distribution required Microsoft to issue vouchers to eligible schools equal in value to two-thirds of the unclaimed or unredeemed portion of the total settlement amount, and that for this reason Microsoft would be obligated to issue vouchers worth $733 million "even if no class member made a claim for direct Settlement benefits." In making this determination, the court concluded, in effect, that the *cy près* distribution served the purpose of ensuring that Microsoft incurred a minimum liability under the settlement that was equivalent in value to $733 million, or two-thirds of the total settlement amount of $1.1 billion. This conclusion is supported by two declarations submitted by the parties, as well as by the terms of the settlement agreement itself.

We have alluded previously to the fact that the settlement agreement included a provision of "nonadmission." (See fn. 5, *ante.*) Specifically, it provides that Microsoft does not "admit[] the truth of any of the . . . allegations" made by plaintiffs, that the agreement itself "does not . . . embody, reflect, or imply any wrongdoing" on its part, and that the parties "may not represent that it does in any public statement . . . ." Thus, it is evident that one of Microsoft's chief concerns during settlement negotiations, other than limiting its liability and obtaining a release of class claims, was to maintain at least an appearance of innocence. The fact that the parties agreed not to represent wrongdoing on Microsoft's part, together with the trial court's regard for their private agreement, may explain why the court did not explicitly conclude that the *cy près* distribution served a deterrent or disgorgement purpose.[16]

Nevertheless, such a conclusion may be readily implied from a determination of Microsoft's minimum liability. Whereas the settlement agreement provides as much as $1.1 billion in direct compensation, the actual amount of Microsoft's liability for direct compensation is conditioned by the number of claims submitted by individual class members and approved by the settlement

---

[16] The parties prepared and submitted the statement of decision, stipulating that it accurately reflected the modifications the court had made in an earlier draft.

claims administrator. By establishing a minimum liability of $733 million, the *cy près* distribution shows significant usefulness in effectuating the deterrent and disgorgement purposes of the cause of action. (See *Bruno v. Superior Court* (1981) 127 Cal.App.3d 120, 132 [179 Cal.Rptr. 342] ["the prevention and punishment of anticompetitive acts is a not insignificant purpose of antitrust laws"].) "If damages are distributed so as to substantially compensate the injured class members who have recovered the damages, and *especially if that distribution serves to deter violations and disgorge illegal profits,* the letter and spirit of the antitrust laws will have been obeyed." (*Id.* at p. 133, italics added.)

In addition, the court determined that the *cy près* distribution would not "inappropriately benefit Microsoft or extend its market power." It found that "[t]he schools will receive both general purpose vouchers and software vouchers that may be used for a vast array of products and services, including those offered by Microsoft's competitors . . . [and] [t]he schools are free to choose technology that does not involve Microsoft products in any way." By implication, the court thus rejected Jakob's argument that Microsoft's minimum liability under the agreement had no real deterrent effect. Again by reasonable implication, the court determined that, to the contrary, Microsoft's minimum liability would be real and significant—notwithstanding its negotiated retention of the one-third of the value of any unclaimed direct compensation.

We conclude that it was reasonable for the court to make these implied determinations based on the evidence before it. The terms of the agreement explain that the general vouchers may be used to purchase nonMicrosoft hardware or services, and that the software vouchers may be used to purchase nonMicrosoft software. If an eligible school uses a voucher to purchase Microsoft software, it is not unreasonable to conclude that Microsoft still effectively surrenders any profit it might otherwise have realized from that purchase when it redeems that voucher. Further, the agreement precludes any reversion to Microsoft of the value of the vouchers issued to eligible schools. As we have mentioned, it provides that any such unused vouchers will either be redeemed beyond the six-year period or their value will be offered to "other needy organizations in California, to be jointly selected (with court approval)."

In his reply brief, Jakob notes the settlement agreement's inclusion of an express purpose to be served by the proposed *cy près* distribution, that is, "to benefit public schools." He suggests finally that this express intent effectively precluded any determination that the distribution appropriately

served another purpose, such as compensation or deterrence. We disagree. Any purpose expressly stated in a properly negotiated settlement agreement is a product of compromise, and for that reason may not accurately express the extent to which the settlement operates to vindicate the purposes of the law underlying the plaintiffs' claim.

■ When assessing the fairness of a settlement agreement, "[g]reat weight is accorded the trial judge's views," since that judge " ' "is on the firing line and can evaluate the action accordingly." ' " (*7-Eleven, supra*, 85 Cal.App.4th at p. 1145.) We conclude the trial court in this case was within its discretion in determining, explicitly and by implication, that the proposed *cy près* distribution served the compensatory and deterrent purposes of the law underlying the cause of action. The record indicates that the court also acted well within its discretion in determining that, overall, the settlement agreement was fair and not a product of collusion, after due consideration of all the factors relevant to that ruling.

## D. *Conclusion*

Contemporary class actions, and the settlement agreements resolving them, have been characterized as a "fundamental departure" from traditional litigation, to the extent that class counsel, rather than their clients, have "all the initiative and are close to being the real parties in interest." (*7-Eleven, supra*, 85 Cal.App.4th at p. 1166, citing *Mars Steel v. Continental Ill. Nat. Bank & Trust* (7th Cir. 1987) 834 F.2d 677, 678 (*Mars Steel*).) Often the result is a "judicialized administrative process, with the trial judge serving as a kind of glorified mediator . . . ." (*7-Eleven, supra*, at p. 1166.) The reform of abuses arising in such a context is a legislative prerogative, as suggested by the recently enacted federal law that Jakob cites in his reply brief. (See Pub.L. No. 109-2 (Feb. 18, 2005) 119 Stat. 4 [Class Action Fairness Act of 2005]; see also 28 U.S.C. § 1711 et seq.) Meanwhile, we agree with Division Four of this court that in these cases "one aspect of the settlement process does appear salutary: the recognition by the appellate courts that their review function in such circumstances is gross at best and, given that 'so many imponderables enter into the evaluation of a settlement' [citation], an abuse of discretion standard of appellate review is singularly appropriate." (*7-Eleven, supra*, 85 Cal.App.4th at pp. 1166–1167, citing *Mars Steel, supra*, 834 F.2d at p. 682.) The trial court acted with an impartial discretion, guided in its exercise by legal principles. It carried out the literal meaning of *cy près* by approving a fair and reasonable residual distribution that was "as near as possible" to accomplish the overarching purposes of the litigation.

## Disposition

The judgment is affirmed.

Stein, J., and Swager, J., concurred.

A petition for a rehearing was denied February 2, 2006, and appellant's petition for review by the Supreme Court was denied April 19, 2006, S141268. Chin, J., and Corrigan, J., did not participate therein.