[No. A097905. First Dist., Div. Two. Apr. 3, 2003.]

In re VITAMIN CASES.

**[Opinion certified for partial publication.*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part III.B.

COUNSEL

Law Offices of George A. Barton, George A. Barton; Barr & Barr and Joseph M. Morrill for Plaintiffs and Appellants Marianne O'Keefe et al.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, Kathleen E. Foote and Ann Marie Marciarille, Deputy Attorneys General, for Defendant and Respondent State of California.

Pillsbury & Winthrop, Sarah G. Flanagan and Kevin M. Fong for Defendant and Respondent BASF Corporation.

Lieff, Cabraser, Heimann & Bernstein, William Bernstein, Joseph R. Saveri, Steven M. Tindall; Saveri & Saveri, Guido Saveri, R. Alexander and Geoffrey Rushing for Defendant and Respondent Class Plaintiffs.

OPINION

HAERLE, J.—

## I. INTRODUCTION

In this appeal, four class members challenge the settlement of a class action complaint, which had been brought against a number of manufacturers of vitamin products. They contend that Code of Civil Procedure section 384 (section 384) bars the settlement because it does not allow the members of their class to make individual claims, instead awarding the entire settlement to charitable and nonprofit organizations. We conclude that section 384 does not bar the settlement in this case and, accordingly, affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

This appeal arises from a coordinated proceeding for numerous separate complaints brought on behalf of a class of "[a]ll purchasers located in the

State of California who indirectly purchased vitamins, vitamin premixes, and/or other vitamin products from any of the Defendants for use, but not for resale, at any time during the period January 1, 1988 to" the late 1990's. The coordinated class complaint (the Class Complaint) alleged that defendants, manufacturers of "raw vitamins . . ., vitamin premixes, and other bulk vitamin products for bulk sales," committed price fixing in violation of both the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.) and the unfair competition law (Bus. & Prof. Code, § 17200 et seq.).

On October 31, 2000, the Attorney General, acting on behalf of the People of the State of California, filed a complaint, which contained allegations similar to those in the Class Complaint. Seven of the defendants named in the Class Complaint were also named in the Attorney General's complaint. On November 29, 2000, the trial court granted the People's petition for coordination of its case as an add-on case to the coordinated proceeding.

On August 29, 2001, the class representatives and the People (collectively plaintiffs) filed a motion for preliminary approval of class action settlement with the seven defendants named in the Attorney General's complaint: BASF Corporation, Daiichi Pharmaceutical Co., Ltd., Eisai Co., Ltd., Aventis Animal Nutrition S.A. (formerly Rhone-Poulenc Animal Nutrition, S.A.), Hoffman-La Roche, Inc., Roche Vitamins, Inc., and Takeda Chemical Industries, Ltd. (collectively settling defendants). The settlement agreement contemplated a payment of $16 million for attorney fees and the certification of two classes for settlement purposes only. One class, described as the consumer settlement class (Consumer Class), was to consist of "[a]ll natural persons . . . who purchased Indirect Vitamin Products during the Relevant Period for use or consumption by themselves and/or others and not for resale in any form, and who are residents of the State of California." In settlement of the claims of the Consumer Class, $38 million was to be distributed to charitable, governmental and nonprofit organizations that promote the health and nutrition of consumer class members or that otherwise further the purposes underlying the lawsuit.

The second class, described as the commercial settlement class (Commercial Class), was to consist of certain purchasers of "Indirect Vitamin Products for resale, for incorporation into another product or products for resale, or for use in the manufacture, processing or development of another product (including the feeding of an animal) for resale . . . ." The Commercial Class was to be paid up to $42 million.

The motion explained that notice would be given to the class members by publication and attached a copy of the proposed notice. The notice explained

that the "Consumer Settlement Amount (i.e., $38 million minus court-approved costs and expenses, plus interest) will be distributed, pursuant to a court-approved plan of distribution, to eligible organizations that collectively are, as nearly as practicable, representative of the interests of injured consumers. . . . [¶] The consumer settlement amount will not be paid to individual California consumers for the following four reasons: (a) the impracticability of processing the potential claims of 30 million individuals who purchased Indirect Vitamin Products during the Relevant Period; (b) the expense and inconvenience to individual class members associated with having to document specific purchases of Indirect Vitamin Products over a span of more than ten years; (c) the potential unfairness to class members who are unable to provide evidence of their purchases of Indirect Vitamin Products during the Relevant Period; and (d) the high cost of administering direct cash payments to millions of consumers relative to the average likely award to those consumers." The notice further explained the process by which class members could opt-out of the settlement.

On September 19, 2001, the trial court gave its preliminary approval of the proposed settlement, including its planned publication of notice. The court scheduled a hearing on "final settlement approval" for January 18, 2002.

On November 14, 2001, appellants, each an alleged member of the Consumer Class, filed a motion for intervention. They sought to object to the settlement of the Consumer Class claims on the ground that the settlement did not provide the members of the Consumer Class an opportunity to obtain their proportionate share of the proposed settlement prior to its allocation to *cy près* relief. Appellants further argued that representation of both the Consumer and Commercial Classes by the same attorneys constituted a conflict of interest. On December 21, 2001, the trial court denied the motion for intervention, explaining in part that "[o]n the existing record it has not been shown that class counsel have a prohibited conflict of interest in representing both the consumer class and the commercial class . . . ."

On December 10, 2001, appellants filed objections to the proposed Consumer Class settlement. On January 18, 2002, the trial court filed its "Final Order Approving Consumer Class Settlement And Final Judgment" and "Final Order Approving Commercial Class Settlement And Final Judgment." With respect to the Consumer Class, the trial court found "that the *cy près* distribution of the Consumer Class Settlement proceeds is proper because of the following three reasons: (1) it is impracticable or impossible to compensate direct victims of the alleged wrongdoing because of the disproportionate administrative expenses resulting from the number of potential claimants in

relation to the size of the fund; (2) there is a strong correlation between the proposed use of the funds and the class benefited; and (3) the proposed relief furthers the purpose of the relevant statute."[1]

## III. DISCUSSION

### A. *The Propriety of the Cy Près Remedy*

The settlement agreement contemplates distribution of the entire Consumer Class settlement to charitable, governmental and nonprofit organizations. Appellants refer to this remedy as a *cy près* remedy. ■ The doctrine of *cy près* originated in the common law of charitable trusts: "Where compliance with the literal terms of a charitable trust became impossible, the funds would be put to 'the next best use,' in accord with the dominant charitable purposes of the donor. [Citation.]" (*State of California v. Levi Strauss & Co.* (1986) 41 Cal.3d 460, 472 [224 Cal.Rptr. 605, 715 P.2d 564] (*Levi Strauss*).) ■ In the context of a class action, the term "fluid recovery" is often used instead of the phrase "*cy près* remedy." (*Kraus v. Trinity Management Services, Inc.* (2000) 23 Cal.4th 116, 127 [96 Cal.Rptr.2d 485, 999 P.2d 718] (*Kraus*).) "The theory underlying fluid class recovery is that since each class member cannot be compensated exactly for the damage he or she suffered, the best alternative is to pay damages in a way that benefits as many of the class members as possible and in the approximate proportion that each member has been damaged, even though, most probably, some injured class members will receive no compensation and some people not in the class will benefit from the distribution . . . ." (*Bruno v. Superior Court* (1981) 127 Cal.App.3d 120, 123-124 [179 Cal.Rptr. 342] (*Bruno*).)

■ Appellants argue that section 384 precludes a *cy près* remedy or fluid recovery where the class members have not first been given an opportunity to obtain their appropriate share of the settlement. Because this argument requires statutory interpretation, our review is de novo. (See *American Nat. Ins. Co. v. Low* (2000) 84 Cal.App.4th 914, 923-924 [101 Cal.Rptr.2d 288].)

■ "Pursuant to established principles, our first task in construing a statute is to ascertain the intent of the Legislature so as to effectuate the purpose of the law. In determining such intent, a court must look first to the words of the statute themselves, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and

---

[1]Similar class actions have been filed around the country in both state and federal courts and purportedly are also in the process of being settled.

sentence in pursuance of the legislative purpose. . . . The words of the statute must be construed in context, keeping in mind the statutory purpose . . . . Where uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation. [Citation.] Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent. [Citations.]" (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386-1387 [241 Cal.Rptr. 67, 743 P.2d 1323].)

■ Appellants' argument relies on the following language in section 384: "[P]rior to the entry of any judgment in a class action established pursuant to Section 382, the court shall determine the total amount that will be payable to all class members, if all class members are paid the amount to which they are entitled pursuant to the judgment. The court shall also set a date when the parties shall report to the court the total amount that was actually paid to the class members. After the report is received, the court shall amend the judgment to direct the defendant to pay the sum of the unpaid residue, plus interest on that sum at the legal rate of interest from the date of entry of the initial judgment, to nonprofit organizations or foundations to support projects that will benefit the class or similarly situated persons, or that promote the law consistent with the objectives and purposes of the underlying cause of action, to child advocacy programs, or to nonprofit organizations providing civil legal services to the indigent." (§ 384, subd. (b).)

A careful reading of section 384, subdivision (b), reveals that it does not *require* that individual class members receive a portion of the award, but instead *assumes* that the terms of the judgment so provide. (See § 384, subd. (b) ["amount to which they are entitled pursuant to the judgment"].) Where that assumption is incorrect, as it is here because the judgment does not provide for a recovery by the individual class members, the procedures of section 384, subdivision (b), are inapplicable. Hence, section 384 does not preclude the Consumer Class settlement in this case.

This conclusion finds further support in subdivision (a) of section 384, which explains that it was the Legislature's intent "to ensure that the unpaid *residuals* in class action litigation are distributed, to the extent possible, in a manner designed either to further the purposes of the underlying causes of action, or to promote justice for all Californians." (§ 384, subd. (a), italics added.) Section 384's focus on the distribution of unpaid residuals is repeated in its subdivision (c), which states: "this section shall not be construed to abrogate any equitable cy pres remedy which may be available in any class action with regard to all or part of the residue." (§ 384, subd. (c),

italics added.) Thus, section 384 uniformly indicates an intent to address distribution of residue.

A "residue" is not equivalent to the settlement fund. It is instead "something that remains after a part is taken, separated or designated"; it is the remnant or remainder. (Webster's 9th New Collegiate Dict. (1984) p. 1003.) Residue can arise, for instance, when funds remain undistributed even after completion of the claims procedure permitted by the judgment. Our courts have used the word "residue" in this sense for nearly two decades. (See *Levi Strauss, supra,* 41 Cal.3d at p. 471 ["Indeed, it appears that intervener and amici are principally concerned not with reversing the settlement, but with advocating a particular use for the residue remaining after individual distribution."]; *Kraus, supra,* 23 Cal.4th at pp. 127-128 [Fluid recovery developed as a means by which to distribute the residue of a favorable class action judgment remaining after payment to those class members who have sufficient interest in obtaining recovery and can produce the documentation necessary to file individual claims.].) Thus, the procedure established by section 384 applies when there exists an undistributed residue, for example, when the class award allows for distribution to class members and yet settlement or judgment funds remain after that procedure is completed.

The legislative history underscores section 384's focus on the distribution of "residue." The Senate Floor analyses of the bill to add section 384 explains that "[i]n class action settlements, an unclaimed balance of the total class recovery ('residue') often remains undistributed either because the claimants cannot be located or because the claimants choose not to collect the award which may be just a few dollars or less. . . . When the [settlement] agreement is *silent* on the distribution of the remaining funds, the court makes the decision. [¶] The proposed legislation would require that *these funds* be distributed in any manner which the court determines is consistent with the objectives and purposes of the underlying causes of action . . . ." (Off. of Sen. Floor Analyses, Rep. on Sen. Bill No. 536 (1993-1994 Reg. Sess.) as introduced, italics added.)

The reason for heightened concern regarding the distribution of such a residue is manifest. ■ The purpose of class notice in the context of a settlement is to give class members sufficient information to decide whether they should accept the benefits offered, opt out and pursue their own remedies, or object to the settlement. (*Trotsky v. Los Angeles Fed. Sav. & Loan Assn.* (1975) 48 Cal.App.3d 134, 151-152 [121 Cal.Rptr. 637].) When distribution of a settlement fund or a judgment following trial does not

consume the entire fund or award and the settlement agreement or judgment does not describe the intended disposition of the residue, the class members will have no means of objecting to the later adoption of a distribution method. Section 384 fills that gap by requiring that the court ensure that the residue is directed to an appropriate nonprofit organization or foundation. In contrast, a settlement such as the one here will not produce a residue whose distribution was not explained to the class. The Consumer Class members will be fully informed of the nature of the intended distribution and afforded an opportunity to opt out or object. Accordingly, the rights of the Consumer Class members do not need the judicial protection provided by section 384.

Nor does distribution of the fund in the manner contemplated by this settlement transgress the procedural due process rights of the Consumer Class members. The primary purpose of procedural due process is to provide affected parties with the right to be heard at a meaningful time and in a meaningful manner. (*Ryan v. California Interscholastic Federation-San Diego Section* (2001) 94 Cal.App.4th 1048, 1072 [114 Cal.Rptr.2d 798] (*Ryan*).) It does not guarantee any particular procedure but is rather an "elusive concept," requiring only " 'notice reasonably calculated to apprise interested parties of the pendency of the action affecting their property interest and an opportunity to present their objections.' " (*Id.* at p. 1072.) The requirements of due process are met when, as here, the notice explains that the proposed settlement provides solely for the distribution of funds to nonprofit organizations and foundations, states that there will be no payments to individual California consumers, and informs the class members of their options of opting out or objecting.

*Bruno,* on which appellants rely, does not conflict with this conclusion. In *Bruno,* the class action complaint sought an award that would be distributed first to individual claims and then to *cy près* recovery. (*Bruno, supra,* 127 Cal.App.3d at p. 123.) On appeal, the court explained that "class members will have due process rights jeopardized when damages are distributed by fluid class recovery, but those rights can be protected by notice and claim procedures that give class members an adequate opportunity to obtain their individual shares before the residue is distributed through a fluid recovery procedure." (*Id.* at p. 129.) While those rights "can be protected by notice and claim procedures," (*ibid.*) we conclude that they can also be protected by complete disclosure as to the nature of the intended distribution of the entire class award.

Moreover, whenever we construe a statute, we are bound to consider the consequences that flow from a particular interpretation of a statute. (*Dyna-Med, Inc. v. Fair Employment & Housing Com., supra,* 43 Cal.3d at pp.

1386-1387.) ■ Under appellants' interpretation of section 384, individual claims must be allowed regardless of whether distribution and administration costs will exceed the recovery. We are loath to construe the statute as imposing such an incongruous result.

Just such a result is likely here if we interpret the statute as appellants advocate. The vitamins that settling defendants manufactured and sold were used not only in vitamin supplements, but also in beef, pork, chicken, some types of fish and dairy products as well as cereals, margarine, flour, bread, baby food, juice, hair products, weight-loss products and pet food. One could imagine that nearly every consumer in California during the applicable 10-year period is a class member. In fact, in the motion for preliminary approval of the class settlement, the number of potential claimants was estimated to be *30,000,000*. Thus, the size of the class is extremely large. Given the size of the class compared to the size of the award—roughly, $38 million—the amount of individual recovery would surely be quite small.[2]

In contrast, the notification, claims processing, and verification procedures would certainly be quite costly because the individual purchases were small, rendering it highly unlikely that the class members have retained proof of purchase. The managing director of a class action claims administration company averred in a declaration submitted in support of the motion for final approval of the settlement that it would cost between $2.50 and $5 to administer each claim if there were no analysis of the validity, fairness or appropriateness of the claim and no differentiation in awards. He further explained that if the distribution plan were to differentiate between claims, the administration costs would increase by $2 per claim. At $2.50 per claim, the entire consumer class settlement would be consumed by distribution costs if 51 percent of the class members make a claim. At $5 per claim, the same result occurs if 26 percent of the class members make a claim, and at $7 per claim, the percentage drops even further to 19 percent. Moreover, these computations consider neither the increase in attorney fees that would certainly be sought if the settlement contemplated a lengthy claims processing procedure nor the decrease in settlement funds that might occur in response to such an increase in fees.

---

[2]Appellants contend that we should not compare the number of class members to the size of the award, but should instead consider the *likely* number of claimants. Although appellants do not state expressly the number of claimants they anticipate, we can estimate that number from their contention that the average class member would receive approximately $300. Even if the full $38 million were available for distribution to the class members—which it certainly would not be because the costs of administration and distribution would also come from that sum—less than one-half of a percent of the Consumer Class members (assuming a class of 30 million) can receive an award of $300; more than 99 percent of the class members would not receive any award. In other words, appellants' plan is premised on the *hope* that only the smallest fraction of class members will file claims. We know of no authority that would support a plan premised on such a hope.

In fact, had the settlement here required individual class members to attempt to state a claim for a portion of the fund, it might have created distribution problems similar to those described in *Levi Strauss, supra,* 41 Cal.3d 460. In that case, the "Attorney General's office was awarded $1.2 million in attorney fees, and the costs of administration were estimated at $1.8-$2.2 million. The total amount allocated to consumers was approximately $9.3 million." (*Id.* at p. 464.) The recovery for an average individual was estimated at $2.60 to $3, calculated as "between 34 and 40 cents per pair of jeans" purchased by the consumer during a five-year period. (*Ibid.*)

Notices of the settlement and a claim form were mailed to 8,600,000 households and an additional 1,500,000 forms were made available at post offices. (*Levi Strauss, supra,* 41 Cal.3d at p. 469.) 1,400,000 completed forms were received and the trial court ordered that the top 5 percent of the claims be treated as suspect. (*Id.* at pp. 469-470.) Over 75,000 claims were returned to their claimants with instructions to resubmit the claim with a notarized statement confirming its veracity. (*Id.* at p. 470.) "Over 80 percent of these claims were not resubmitted. A similar percentage of claims returned as suspect because of excessive household membership (over 12 individual claimants) were not resubmitted. In all, over $1.6 million in suspect claims were eliminated." (*Ibid.*) By the time the case reached the Supreme Court, the distribution was not complete and yet "[n]early $1.5 million" had already been spent on the distribution plan. (See *id.* at p. 471 [expressing concern regarding "the claimants' current expectations"]; *id.* at p. 470.) We expect that a settlement structure like appellants contend is required here would yield similar problems in proof and expense.

Appellants contend that a number of cases support their conclusion that they must be given an opportunity to claim a portion of the fund before it can be disbursed to nonprofit organizations. However, none of the cases they cite are apposite. In *Levi Strauss,* the dispute on appeal focused on the use of "the residue remaining after individual distribution[s]" from the settlement fund. (*Levi Strauss, supra,* 41 Cal.3d at p. 471.) Thus, quite different from the settlement in this case, the settlement in *Levi Strauss* provided for the recovery of individual damages and did not specify what should be done with the funds that remained after individual claims were processed. Here, as we have emphasized, no similar residue is created by the settlement in this case.

Moreover, contrary to appellants' assertions, *Levi Strauss* does not purport to define the boundaries of the *cy près* doctrine. While that decision generally states that implementation of fluid recovery involves three steps— payment to a class fund, claims by individual class members and distribution

of the residue—it never suggests that it has described the *only* acceptable method. (*Levi Strauss, supra,* 41 Cal.3d at pp. 472-473.)

In *Granberry v. Islay Investments* (1995) 9 Cal.4th 738 [38 Cal.Rptr.2d 650, 889 P.2d 970] (*Granberry*), also cited by appellants, the trial court found that a landlord who, in good faith, fails to comply with the requirements of Civil Code section 1950.5 concerning the return of security deposits, may not thereafter recover damages for unpaid rent, repairs, and cleaning in a judicial proceeding. (*Granberry,* at pp. 741, 743.) The trial court rejected plaintiffs' request "that judgment be entered on behalf of the entire class for the aggregate amount" of damages and that any unclaimed residue escheat to the state. (*Id.* at p. 750.) The trial court instead entered judgment in favor of only those members of the class who might actually come forward and file individual claims. (*Ibid.*)

On appeal, our Supreme Court primarily concluded "that a good faith failure to comply with [Civil Code] section 1950.5, subdivision (f), does not bar a landlord from recovering damages for unpaid rent, repairs, and cleaning . . ." (*Granberry, supra,* 9 Cal.4th at p. 741), a holding that is obviously not relevant to this case. With respect to the class remedy chosen by the trial court, the Supreme Court explained that when the trial court made that choice "it had already held that defendants were not entitled to set off amounts owed for unpaid rent, repair, and cleaning." (*Id.* at p. 751.) The Supreme Court therefore sent the case back to the superior court so that it might "reconsider its choice of remedy . . . ." (*Ibid.*) Thus, on the issue of remedy, *Granberry* provides no guidance.

*Kraus,* another case on which appellants rely, is even less relevant. In *Kraus,* our Supreme Court concluded that "disgorgement into a fluid recovery fund is not a remedy available in . . . representative [unfair competition law] actions and that Civil Code section 1950.5 does not apply to defendants' nonrefundable security and administrative fees." (*Kraus, supra,* 23 Cal.4th at p. 121.)

 In sum, neither section 384 nor case law requires that a settlement allow for individual claims before its fund can be distributed to *cy près* relief. The settlement in this case was therefore proper.

B. *Class Counsel's Alleged Conflict of Interest**

. . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante,* page 820.

## IV. DISPOSITION

We affirm.[3]

Kline, P. J., and Lambden, J., concurred.

Appellants' petition for review by the Supreme Court was denied June 11, 2003.

---

[3]Given our conclusions regarding both section 384 and appellants' allegations that class counsel had a conflict of interest, we consider neither the propriety of the trial court's decision to deny appellants' motion for intervention nor the People's argument that the *cy près* remedy was appropriate under Business and Professions Code section 16760.