[No. B199511. Second Dist., Div. Three. Oct. 16, 2008.]

DAVID CUNDIFF et al., Plaintiffs and Appellants, v.
VERIZON CALIFORNIA, INC., Defendant and Respondent.

COUNSEL

Hadsell & Stormer, Inc., Dan Stormer, Virginia Keeny, Lauren Teukolsky; Law Offices of Marc Coleman and Marc Coleman for Plaintiffs and Appellants.

Munger, Tolles & Olson, Henry Weissmann, David C. Dinielli and Fred A. Rowley, Jr., for Defendant and Respondent.

OPINION

**KLEIN, P. J.**—Class action plaintiffs filed a consumer protection action against GTE California Inc., now known as Verizon California, Inc. (Verizon), in October of 2000, alleging Verizon engaged in unfair business practices by improperly billing residential customers for rented telephone equipment. In August of 2004, the parties entered into a settlement agreement pursuant to which Verizon agreed to make cash payments to Verizon customers who filed claims in which they averred, under penalty of perjury, they had been unaware of the rental charges. After entry of final judgment, the claims of the eligible Verizon customers were administered and settlement checks were mailed to the claimants. The present dispute involves $414,593.81 in settlement checks that either were not cashed or were returned by the post office as undeliverable.

Over two years after judgment was entered, plaintiffs sought to amend the judgment to distribute these funds pursuant to Code of Civil Procedure section 384, which requires "unpaid residuals in class action litigation" be paid to "nonprofit organizations or foundations to support projects that will benefit the class or similarly situated persons . . . ." (Code Civ. Proc., § 384, subds. (a), (b).)[1] The trial court found, inter alia, section 384 did not apply to the "claims-made" settlement plaintiffs and Verizon had negotiated in this case. Plaintiffs appealed the trial court's ruling.

In resolving the issue presented, we look to the words of section 384, subdivision (b), which define "unpaid residue" as the difference between the "total amount that will be payable to all class members, if all class members are paid the amount to which they are entitled pursuant to the judgment" and "the total amount that was actually paid to the class members." (§ 384, subd. (b).)

We conclude that, notwithstanding the "claims-made" nature of the settlement, the definition of "unpaid residue" accurately describes the unclaimed

---

[1] All further statutory references are to the Code of Civil Procedure.

funds at issue in this case. We also reject Verizon's assertion the legislative history of section 384 suggests it should be applied only in fluid recovery cases in which a common fund is created.

Accordingly, we reverse the trial court's ruling and remand for further proceedings.

## FACTS AND PROCEDURAL BACKGROUND

1. *Plaintiffs' class action lawsuit.*

Following deregulation of the telephone companies in 1984, the California Public Utilities Commission (CPUC) permitted service providers to give customers the option of purchasing telephone equipment from third parties or to continue renting telephones from the service provider if the rental charge was separately identified on the telephone bill. The CPUC also required service providers to include in every customer's bill an insert or mailer advising the customer of the option of purchasing telephone equipment from a third party.

In October of 2000, plaintiffs filed a class action complaint alleging Verizon billed residential customers for "obsolete or non-existent telephones" and therefore collected "undeserved fees without providing or offering meaningful service." The complaint further alleged Verizon failed to identify the "nature of the equipment rental charges and instead denot[ed] the charges simply as 'equipment rental'. . . ." The complaint included causes of action under the Unfair Competition Law for a variety of unfair business practices and fraud. The complaint also alleged causes of action based on consumer protection theories, negligent misrepresentation, unjust enrichment and violations of the false advertising law.

Early in the proceedings, Verizon demurred to the complaint on the ground the CPUC had exclusive jurisdiction over plaintiffs' claims or, alternatively, the primary jurisdiction doctrine applied.[2] The trial court agreed. However, in *Cundiff v. GTE California Inc.* (2002) 101 Cal.App.4th 1395 [125 Cal.Rptr.2d 445], this court reversed the trial court's finding and concluded the trial court had jurisdiction to consider plaintiffs' claims. In so doing, we noted the basis

---

[2] The primary jurisdiction doctrine provides that a claim originally cognizable in the courts may be stayed to allow an administrative agency an opportunity to resolve some or all of the issues. (*Jonathan Neil & Assoc., Inc. v. Jones* (2004) 33 Cal.4th 917, 931–932 [16 Cal.Rptr.3d 849, 94 P.3d 1055].) The doctrine does not foreclose judicial action, but provides the administrative body an opportunity to act if it chooses to do so. (*Wise v. Pacific Gas & Electric Co.* (1999) 77 Cal.App.4th 287, 296 [91 Cal.Rptr.2d 479].)

of plaintiffs' lawsuit was the allegedly intentional or negligent misrepresentation of the true nature of equipment rental charges and concluded, "This is not a topic about which the commission would have more expertise than the trial court, or even as much expertise. Actions based on alleged deceit are not known to be within the technical expertise of the [CPUC]." (*Id.* at p. 1413.)

### 2. *The settlement agreement.*

On remand, plaintiffs and Verizon entered into a comprehensive settlement agreement which identified three main subclasses of the 170,000-member class: legacy customers who rented a telephone throughout the class period; changing customers who changed rental service at some point within the class period; and, customers of Verizon affiliates. Legacy customers were eligible for reimbursement of approximately 90 percent of the rental fees paid between March 1994 and January 2001. Changing customers were eligible to receive 50 percent of the rental fees paid between March 1994 and the date the customer changed service. Customers of Verizon affiliates were to receive transferable calling cards with a value of $10.

The settlement agreement required legacy and changing customers to file a claim in which they declared, under penalty of perjury, they were unaware of the rental charge until they changed their rental service or the rental charge ceased. Legacy and changing customers who did not submit a claim form received a $50 Verizon coupon. Verizon also agreed to pay a $5,000 incentive award to each named plaintiff and to donate a total of $1 million to 20 designated charitable organizations.

Pursuant to the settlement agreement, Verizon was to compile a list of potential class members and publish notice of the class settlement. Following completion of the notice process, the trial court would conduct a final approval hearing and, upon approving the settlement, enter judgment and dismiss the action with prejudice. Once judgment had been entered, Verizon would mail a claim form to each legacy and changing customer. The class members had 90 days to submit a completed claim form. The settlement administrator was to process the forms, compute the amount owed to each customer and notify the parties of the total amount to be distributed. At that point Verizon was to deliver sufficient funds to pay the claims.

The settlement agreement contemplated that plaintiffs' counsel would make a request for attorney fees in connection with the final approval of the settlement agreement. Verizon reserved the right to oppose the request.

### 3. *Motion for attorney fees; final approval of settlement.*

In conjunction with the request for final approval of the settlement agreement, plaintiffs' counsel requested attorney fees computed as a percentage of the common fund created by the settlement. (See *Serrano v. Priest* (1977) 20 Cal.3d 25, 35 [141 Cal.Rptr. 315, 569 P.2d 1303] (*Serrano III*).) Plaintiffs' counsel asserted the "total projected value of the settlement" if all eligible customers filed a claim would be $88,187,912. Plaintiffs' counsel sought $8 million in fees, which amounted to 9 percent of the potential value of the settlement.

Alternatively, plaintiffs' counsel sought attorney fees under the lodestar method. (*Serrano III, supra*, 20 Cal.3d at pp. 48–49.)[3] Plaintiffs' counsel argued the lodestar amount of $884,082.06 should be multiplied by a factor of four. Plaintiffs' counsel also noted that, even when the percentage of the common fund method is inappropriate for computation of attorney fees, it nonetheless may be used as a cross-check of a lodestar-based multiplier. (*Lealao v. Beneficial California, Inc.* (2000) 82 Cal.App.4th 19, 45–46 [97 Cal.Rptr.2d 797].)

Verizon opposed the attorney fees request. Verizon argued the amount of plaintiffs' aggregate recovery was presently unknown. Thus, the common fund doctrine, which assumed a 100 percent claims rate, was inappropriate in this case.

Verizon also argued it had agreed to a claims-made settlement in which the amount to be paid is not a liquidated amount. (*Lealao v. Beneficial California, Inc., supra*, 82 Cal.App.4th at p. 49 [cross-check of lodestar method proper only when the fund "can be monetized with a reasonable degree of certainty . . . ."]; *Serrano III, supra*, 20 Cal.3d at pp. 37–38 [common fund principles inapplicable where equal protection challenge to school funding system did not result in creation of an identifiable fund]; *Dunk v. Ford Motor Co.* (1996) 48 Cal.App.4th 1794, 1809 [56 Cal.Rptr.2d 483] [common fund inapplicable in a coupon only settlement].)

The trial court found the percentage of the common fund method of computing attorney fees did not apply because "the settlement did not create

---

[3] Under this method, the trial court first determines a touchstone or lodestar figure based on the "time spent and reasonable hourly compensation of each attorney . . . involved in the presentation of the case." (*Serrano III, supra*, 20 Cal.3d at p. 48.) The trial court then may adjust the lodestar based on various factors including, (1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, (4) the contingent nature of the fee award. (*Id.* at p. 49; *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132 [104 Cal.Rptr.2d 377, 17 P.3d 735]; *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1096 [95 Cal.Rptr.2d 198, 997 P.2d 511].)

a true fund . . . ." Rather, "it . . . is a claims-made settlement." Thus, there was "no way of knowing what the ultimate value of the settlement will be." Using the lodestar method, the trial court awarded plaintiffs' counsel attorney fees in the amount of $1,729,164.12.

### 4. Administration of the claims and disclosure of unclaimed funds.

After entry of final judgment in December of 2004, the settlement administrator processed the claim forms and computed the amount due to the various subclasses of plaintiffs. Verizon then deposited with the settlement administrator the amount required to fund the claims and the settlement administrator mailed checks to the claimants as required by the settlement agreement.

In September of 2006, the settlement administrator advised the parties that 518 settlement checks with a value of $274,480.11 that had been mailed to legacy and changing customers remained uncashed. Also, 260 letters containing $137,196.75 in settlement checks had been returned to the settlement administrator. The uncashed and returned checks were no longer valid, having expired six months after issuance. The settlement administrator indicated it held $414,593.81 in funds earmarked to pay the expired checks.

### 5. The trial court's ruling on plaintiffs' motion to amend the judgment under section 384.

When the parties could not agree on the disposition of the unclaimed funds, plaintiffs filed a motion to amend the judgment pursuant to section 384 to direct the settlement administrator to pay the unclaimed funds on a pro rata basis to the charities designated in the settlement agreement.

The trial court concluded section 384 did not apply to the "claims-made settlement" the parties had negotiated because no common fund had been created. The trial court further found it lacked any legal basis on which to modify the judgment under section 473, subdivision (b), because more than two years had passed since entry of judgment.[4] Thus, the judgment could not be modified unless extrinsic fraud or mistake could be shown. (*In re Marriage of Umphrey* (1990) 218 Cal.App.3d 647, 655 [267 Cal.Rptr. 218].) Here, the parties simply failed to provide for the possibility of unclaimed funds in the settlement agreement.

---

[4] Section 473, subdivision (b) provides, in part: "(b) The court may, upon any terms as may be just, relieve a party or his or her legal representative from a judgment, dismissal, order, or other proceeding taken against him or her through his or her mistake, inadvertence, surprise, or excusable neglect. Application for this relief shall be . . . made within a reasonable time, in no case exceeding six months, after the judgment, dismissal, order, or proceeding was taken."

As a consequence of this ruling, the unclaimed funds reverted to Verizon.

## CONTENTIONS

Plaintiffs contend the unclaimed funds constitute "unpaid residue" within the meaning of section 384, subdivision (b), and the trial court was required to direct these funds to nonprofit organizations or foundations to support projects that will benefit the class or similarly situated persons.

## DISCUSSION

1. *The plain language of section 384 indicates application here.*

   a. *Section 384.*

Section 384, subdivision (a) states: "[T]he intent of the Legislature in enacting this section [is] to ensure that the unpaid residuals in class action litigation are distributed, to the extent possible, in a manner designed either to further the purposes of the underlying causes of action, or to promote justice for all Californians. . . ."

Section 384, subdivision (b) states: "[P]rior to the entry of any judgment in a class action established pursuant to Section 382, the court shall determine the total amount that will be payable to all class members, if all class members are paid the amount to which they are entitled pursuant to the judgment. The court shall also set a date when the parties shall report to the court the total amount that was actually paid to the class members. After the report is received, the court shall amend the judgment to direct the defendant to pay the sum of the unpaid residue . . . to nonprofit organizations or foundations to support projects that will benefit the class or similarly situated persons, or that promote the law consistent with the objectives and purposes of the underlying cause of action, to child advocacy programs, or to nonprofit organizations providing civil legal services to the indigent. . . ."

   b. *Principles of statutory construction.*

"Pursuant to established principles, our first task in construing a statute is to ascertain the intent of the Legislature so as to effectuate the purpose of the law. In determining such intent, a court must look first to the words of the statute themselves, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose. . . . The words of the statute must be construed in context, keeping in mind the statutory purpose . . . . [Citations.] . . . Both the legislative history of the statute and the wider

historical circumstances of its enactment may be considered in ascertaining the legislative intent. [Citations.]" (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386–1387 [241 Cal.Rptr. 67, 743 P.2d 1323]; see *In re Vitamin Cases* (2003) 107 Cal.App.4th 820, 826–827 [132 Cal.Rptr.2d 425].)

We therefore commence our analysis with the words of the statute.

   c.  *Section 384's definition of unpaid residue applies to the uncashed and returned settlement checks.*

■  As noted above, section 384 defines "unpaid residue" as the difference between the "total amount that will be payable to all class members" and "the total amount that was actually paid to the class members." (§ 384, subd. (b).)

Applying these words to this case, the aggregate amount owed to Verizon customers who filed claim forms declaring they were unaware of the rental billing practice clearly falls within the first part of the definition, namely, the "total amount . . . payable to all class members . . . ." (§ 384, subd. (b).) This "total amount . . . payable to all class members" was established when the settlement administrator determined the amount necessary to satisfy the filed claims.

The difference between the "total amount . . . payable to all class members" and "the total amount that was actually paid to the class members," describes the unclaimed funds at issue in this case. Thus, the plain meaning of the words of the statute indicates the unclaimed funds constitute "unpaid residue" within the meaning of section 384, subdivision (b). Indeed, we cannot characterize the unclaimed funds in any manner other than as residue within the meaning of section 384.

   d.  *The legislative history of section 384 supports this view.*

A statement of the legislative intent in enacting section 384 is found in subdivision (a). It states the Legislature intended "to ensure that the unpaid residuals in class action litigation are distributed, to the extent possible, in a manner designed either to further the purposes of the underlying causes of action, or to promote justice for all Californians. . . ." (§ 384, subd. (a).)

The origin of this statement of legislative intent was discussed in two cases that construed section 384 in the context of objections to proposed settlements, *In re Microsoft I-V Cases* (2006) 135 Cal.App.4th 706 [37 Cal.Rptr.3d 660] (*Microsoft I-V*) and *In re Vitamin Cases, supra,* 107 Cal.App.4th 820.

*Microsoft I-V* referred to the "Senate Floor analysis prepared by the Senate Rules Committee for introduction of the 1993 bill that led to the initial enactment of the statute that has since been renumbered as section 384. (Sen. Rules Com., Off. of Sen. Floor Analyses, Rep. on Sen. Bill No. 536 (1993–1994 Reg. Sess.) as introduced. (Senate Floor analysis).)" (*Microsoft I-V, supra*, at p. 720.) *Microsoft I-V* noted the Senate Floor analysis "explained that there was 'often' an 'unclaimed balance of the total class recovery ("residue") . . . either because the claimants cannot be located or . . . choose not to collect the award . . . .' " (*Microsoft I-V, supra*, at p. 720.)

*Microsoft I-V* further observed: "One significant concern expressed in the same Senate Floor analysis was that 'a defendant [might] argue that any unclaimed class action funds must be returned . . . .' [Citation.] The analysis explained that '*unless there is a court approved settlement which provides for reversion of remaining funds to the defendant* . . . the general rule is that defendants do not have a . . . right to recover the funds once they have deposited the funds into an escrow account.' [Citation.] With regard to this concern the analysis concluded that '[r]ather than allowing [the unclaimed residue] to revert to the defendant, this bill would require the Court to distribute the residual in a manner consistent with the action or to remit the funds to the fund named in the legislation.' [Citation.]" (*Microsoft I-V, supra*, 135 Cal.App.4th at p. 720.)

The Senate Floor analysis appears to be aimed directly at the unclaimed funds at issue here, which Verizon deposited into an escrow account for payment to eligible claimants who now cannot be located or have chosen not to cash their checks. This is virtually identical to the situation envisioned by the Senate Floor analysis. Further, the trial court's ruling permitted the unclaimed funds to revert to Verizon and the quoted material reveals the legislators understood reversion would occur only where the parties agreed that unclaimed funds would revert to the defendant.

Thus, *Microsoft I-V* approved a settlement provision whereby one-third of any coupons that were issued but never used would revert to the defendant as against an objection that section 384 required distribution of unclaimed residue only as specified in subdivision (b). *Microsoft I-V* found such a provision permissible as long as it did not render the settlement unfair, inadequate or unreasonable. (*Microsoft I-V, supra*, 135 Cal.App.4th at p. 723; see also *7-Eleven Owners for Fair Franchising v. Southland Corp.* (2000) 85 Cal.App.4th 1135, 1146 [102 Cal.Rptr.2d 777]; *Dunk v. Ford Motor Co., supra*, 48 Cal.App.4th at pp. 1800–1802.) Here, the settlement agreement did not address the possibility of unclaimed funds.

■ We are aware that reversion to a defendant may be appropriate where deterrence is not a factor (see 3 Conte & Newberg, Newberg on Class

Actions (4th ed. 2002) §§ 10:15, 10:17, pp. 512–513, 518), and here Verizon steadfastly denied wrongdoing. Thus, reasonable minds could conclude reversion might otherwise be an appropriate result in this case. However, in the absence of a reversion provision in the settlement agreement, section 384 has eliminated the prospect of reversion of unpaid residue to a defendant, in that it requires payment of such residue to nonprofit organizations.

■ We therefore conclude both the plain meaning of the words of the statute and its legislative history indicate the unclaimed funds at issue in this case constitute "unpaid residue" within the meaning of section 384, subdivision (b). We next address Verizon's assertion section 384 applies only in fluid recovery cases.

2. *Section 384 is not limited to fluid recovery cases.*

a. *Fluid recovery in general.*

■ "The term 'fluid recovery' refers to the application of the equitable doctrine of *cy près* in the context of a modern class action." (*Granberry v. Islay Investments* (1995) 9 Cal.4th 738, 750, fn. 7 [38 Cal.Rptr.2d 650, 889 P.2d 970], citing *State of California v. Levi Strauss & Co.* (1986) 41 Cal.3d 460, 472 [224 Cal.Rptr. 605, 715 P.2d 564] (*Levi Strauss*).) "*Cy près* derives from the Norman French *cy près comme possible*, literally, 'as near as possible.' " (*Microsoft I-V, supra,* 135 Cal.App.4th at p. 716, fn. 8.) " 'Where compliance with the literal terms of a charitable trust became impossible, the funds would be put to "the next best use," in accord with the dominant charitable purposes of the donor. [Citation.]' . . . 'The theory underlying fluid class recovery is that since each class member cannot be compensated exactly for the damage he or she suffered, the best alternative is to pay damages in a way that benefits as many of the class members as possible and in the approximate proportion that each member has been damaged, even though, most probably, some injured class members will receive no compensation and some people not in the class will benefit from the distribution . . . .' [Citation.]" (*In re Vitamin Cases, supra,* 107 Cal.App.4th at p. 826.)

With respect to the procedure for distribution of damages in fluid recovery cases, *Levi Strauss* stated, "The implementation of fluid recovery involves three steps. [Citation.] First, the defendant's total damage liability is paid over to a class fund. Second, individual class members are afforded an opportunity to collect their individual shares by proving their particular damages, usually according to a lowered standard of proof. Third, any residue remaining after individual claims have been paid is distributed by one of several practical procedures that have been developed by the courts." (*Levi Strauss, supra,* 41 Cal.3d at pp. 472–473.)

*Cy près* or fluid recovery has been applied to distribute the total amount of damages assessed against a defendant where each individual's recovery may be too small to make traditional methods of proof and distribution worthwhile. (*Levi Strauss, supra*, 41 Cal.3d at pp. 471–472.)

*Cy près* or fluid recovery also may be used to distribute a residue that remains after claims are paid "to those class members who have sufficient interest in obtaining recovery and can produce the documentation necessary to file individual claims." (*Krause v. Trinity Management Services, Inc.* (2000) 23 Cal.4th 116, 128 [96 Cal.Rptr.2d 485, 999 P.2d 718] (*Krause*).) *Levi Strauss* recognized several methods of fluid recovery, including a rollback of consumer prices, the creation of a consumer trust fund, providing additional pro rata payments to class members who already have filed claims and escheat to the government. (See *Levi Strauss, supra*, 41 Cal.3d at p. 473.) *Levi Strauss* remanded the case to permit the trial court to select the most appropriate method in that case.

b. *Verizon's argument.*

Verizon argues the procedure established by subdivision (b) of section 384 for entry of judgment in a class action so closely resembles *Levi Strauss*'s statement of the procedure for distribution of damages in fluid recovery cases that the Legislature must have intended section 384 to apply only where a common fund is established for the benefit of a class and against which individual class members may make claims.[5] According to Verizon, section 384, subdivision (b), addresses a problem that arises exclusively in common fund or fluid recovery cases.

Verizon contends the instant settlement agreement does not provide for a common fund or fluid recovery. Rather, the parties agreed to a claims-made

[5] Section 384, subdivision (b) states: "[P]rior to the entry of any judgment in a class action established pursuant to Section 382, the court shall determine the total amount that will be payable to all class members, if all class members are paid the amount to which they are entitled pursuant to the judgment. The court shall also set a date when the parties shall report to the court the total amount that was actually paid to the class members. After the report is received, the court shall amend the judgment to direct the defendant to pay the sum of the unpaid residue, plus interest on that sum at the legal rate of interest from the date of entry of the initial judgment, to nonprofit organizations or foundations to support projects that will benefit the class or similarly situated persons, or that promote the law consistent with the objectives and purposes of the underlying cause of action, to child advocacy programs, or to nonprofit organizations providing civil legal services to the indigent. . . ."

We note in passing the trial court did not follow this procedure. Rather, pursuant to the settlement agreement, the trial court entered judgment before the claims were administered. Obviously, the better practice for parties drafting settlement agreements and trial courts implementing them is to conform to the statutory provisions for entry of judgment in a class action.

procedure. The money at issue, Verizon asserts, is not the residue of funds allocated to a class, but constitutes lapsed or unclaimed settlement payments. Verizon finds support for its argument in the observation of *Krause* that the "Legislature authorized employment of a fluid recovery remedy in class actions by the 1993 enactment of . . . section 384." (*Krause, supra*, 23 Cal.4th at p. 128.) Verizon concludes the unclaimed funds must revert to Verizon because there is no legal basis to amend the judgment to allow any other distribution.

### c. *Resolution.*

Verizon's comparison of the procedure set forth in *Levi Strauss* with the procedure established by subdivision (b) of section 384 does not reveal a legislative intent to limit application of that provision to fluid recovery cases or cases in which the defendant has paid into a common fund for the benefit of a class. Indeed, the legislative history suggests the enactors intended a broad application.

Here, no fund was established at the time final judgment was entered. However, after the claims were administered and Verizon deposited the money necessary to pay the claims, a fund was created. The unclaimed funds at issue are the "unpaid residue" of that fund.

### 3. *Verizon's assertion plaintiffs' motion to amend the judgment is time-barred.*

Verizon contends plaintiffs' motion to amend the judgment was filed long after the six-month deadline of section 473, subdivision (b) had expired. Thus, the trial court lacked jurisdiction to amend the judgment. (See *Sporn v. Home Depot USA, Inc.* (2005) 126 Cal.App.4th 1294, 1299 [24 Cal.Rptr.3d 780].)

This argument fails because plaintiffs' motion to amend the judgment did not rely on section 473, subdivision (b), which addresses relief from default in general. Rather, plaintiffs expressly relied on section 384, which does not include any time limit within which relief must be sought. The specific directive to amend the judgment in appropriate class action cases must be seen as taking precedence over the general relief provisions of section 473, subdivision (b). (*Miller v. Superior Court* (1999) 21 Cal.4th 883, 895 [89 Cal.Rptr.2d 834, 986 P.2d 170] [" ' "A specific provision relating to a particular subject will govern in respect to that subject, as against a general provision, although the latter, standing alone, would be broad enough to include the subject to which the more particular provision relates." ' [Citations.]"]; § 1859.)

## DISPOSITION

The order is reversed and the matter is remanded for further proceedings. Plaintiffs shall receive their costs on appeal.

Kitching, J., and Aldrich, J., concurred.