Filed 2/10/16  Mount v. Wells Fargo Bank CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| WILLIAM MOUNT et al., | B260585 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. BC395959) |
| v. | |
| WELLS FARGO BANK, N.A., | |
| Defendant and Respondent, | |
| JAMES COLLINS et al., | |
| Objectors and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Amy D. Hogue, Judge.  Affirmed.

Arleo Law Firm, Elizabeth J. Arleo; Kron & Card and Scott A. Kron for Objectors and Appellants.

Kiesel Law, Paul R. Kiesel, Jeffrey A. Koncius, Matthew A. Young; Johnson & Johnson, Neville Johnson and Douglas Johnson for Plaintiffs and Respondents.

Severson & Werson, Mark D. Lonergan, Jan T. Chilton, Kalama M. Lui-Kwan and Erik Kemp for Defendant and Respondent.

* * * * * *

Appellants James Collins, Denise Phillips, and Stephen Kron (collectively, the objectors) objected to the trial court's approval of a $5.6 million class action settlement with defendant Wells Fargo Bank, N.A. (Wells Fargo).  On appeal, they object to several procedural aspects of the settlement, the scope of the release, and the amount of attorney fees that the court awarded to class counsel.  We conclude their contentions lack merit and affirm.

## FACTS AND PROCEDURE

### 1.  *Commencement of the Actions, Discovery, and Settlement*

Plaintiffs Madeline and William Mount filed their putative class action against Wells Fargo in August 2008 (Mount action).  The Mounts alleged Wells Fargo had surreptitiously recorded or monitored borrowers' telephone conversations with the bank without informing them or obtaining their consent to do so.  The first cause of action alleged a violation of California's Invasion of Privacy Act (Privacy Act) (Pen. Code, § 630 et seq.) and sought statutory remedies.[1]  The second and third causes of action alleged negligence and violation of the common law right of privacy, respectively.  Wells Fargo removed the Mount action to federal court in September 2008, but the federal court remanded the action to Los Angeles County Superior Court in November 2008.

The parties exchanged written discovery beginning in December 2008.  The Mounts took the deposition of four Wells Fargo employees, and Wells Fargo deposed the Mounts.

The Mounts moved for class certification in October 2010, which Wells Fargo opposed.  Wells Fargo argued class certification was not appropriate because individual issues predominated.  The bank submitted evidence that, during the class period, it did not record a significant number of the calls between collections or

---

[1]	Penal Code section 637.2 permits a person who has sustained injury under the Privacy Act to bring a civil action against the perpetrator for (1) the greater of $5,000 or three times the amount of actual damages, if any, and (2) injunctive relief.

customer service personnel and borrowers because of technical problems. There was no automated way to determine whether calls were recorded, and if they were, whether they were recorded without consent. Moreover, Wells Fargo's evidence showed it took steps to ensure borrowers knew the bank may have been recording calls. When borrowers called the bank, before being transferred to a live person, they heard an automated recording informing them that calls may be monitored. Collections personnel made the vast majority of outbound calls, and Wells Fargo trained them (as well as customer service personnel making outbound calls) to provide a recording disclaimer. By way of example, Wells Fargo's audit of outbound calls for January through June 2010 showed errors in providing the recording disclaimer in only 0.35 percent of 85,343 nationwide calls. For the calls that the bank recorded, someone would have to listen to each call to determine whether Wells Fargo provided the recording disclaimer and thus obtained the borrower's consent.

In December 2010, the court deferred ruling on the class certification motion to permit the Mounts to conduct additional discovery. The Mounts conducted additional formal and informal discovery, including retaining an expert to conduct a five-day inspection of Wells Fargo's call-recording system at its facility in Iowa.

In spring 2011, the Mounts began informal settlement discussions with Wells Fargo, and in November 2011, the parties participated in a settlement conference before the Honorable Peter D. Lichtman (Ret.).

In March 2012, another plaintiff, Schuyler Hoffman, filed a putative class action against Wells Fargo in the United States District Court, Southern District of California (Hoffman action). Hoffman alleged claims similar to the Mounts' claims— that is, that Wells Fargo had recorded calls with borrowers without their knowledge. In addition to alleging causes of action under the Privacy Act, for common law invasion of privacy, and for negligence, the Hoffman action alleged a violation of the unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.). Hoffman and Wells Fargo attended an early neutral evaluation conference before the Honorable David H. Bartick in the Southern District of California. They jointly dismissed the

3

federal action without prejudice to Hoffman's right to join the Mount action and pursue a settlement with Wells Fargo along with the Mounts.

After Judge Lichtman retired from the bench, the court in the Mount action appointed him referee pursuant to Code of Civil Procedure sections 638 and 644. In April 2012, the Mounts and Wells Fargo attended another settlement conference with Judge Lichtman. The Mounts, Hoffman, and Wells Fargo participated in several further conferences with Judge Lichtman in an attempt to resolve the matter.

In October 2012, the parties reached an agreement in principle to settle the claims in the Mount and Hoffman actions. The parties had numerous conference calls with the Honorable Anthony J. Mohr, the judge originally assigned to the Mount action, while they were drafting the settlement agreement. They entered into the settlement agreement in February 2014, and the Mounts and Hoffman filed their motion for preliminary approval of the class action settlement in February 2014.

Without admitting wrongdoing, Wells Fargo agreed to pay a nonreversionary gross settlement of $5.6 million. The parties allocated $5 million of the gross settlement fund to class members who Wells Fargo called from July 13, 2006, through October 3, 2008, and $600,000 to class members who Wells Fargo called from October 4, 2008, through December 31, 2012. Class members could make claims under one or both periods. The parties agreed to incentive awards of $25,000 each for the Mounts and $5,000 for Hoffman. They also agreed to attorney fees and costs for class counsel not to exceed $1,916,667. The incentive awards, attorney fees and costs, and class administrator fees and costs would be deducted from the gross settlement fund. Each settlement class member who submitted a valid claim would be entitled to a pro rata share of whatever remained of the settlement fund. The claims administrator would distribute as *cy près* the residue of any checks uncashed after six months to the Berkman Center for Internet & Society at Harvard University; theUniversity of California-Hastings College of Law, Privacy & Technology Project; and the Privacy Rights Clearinghouse.

4

The released claims under the settlement agreement included all causes of action against Wells Fargo that were based on or related to "the conduct, omissions, duties or matters during the Class Period that were or could have been alleged" in the Mount and Hoffman actions. More specifically, the release included, "by way of example but not limitation, purported violations of the Privacy Act set forth in California Penal Code sections 630, *et seq*., purported violations of California Business & Professions Code section 17200, *et seq*., negligence, and any violation of the common law right of privacy to the extent they involve claims based on the recording of telephone conversations which took place in connection with the servicing of real estate-secured loans by Wells Fargo that were recorded, eavesdropped upon, wiretapped, or monitored by Wells Fargo."

## 2. *Preliminary and Final Approval of Settlement*

The Mounts and Hoffman moved for preliminary approval of the settlement in February 2014, and the court granted the motion in April 2014. The court permitted them to file a consolidated amended class action complaint, which added Hoffman as a named plaintiff and alleged the same theories of recovery as the original Mount complaint.

On April 28, 2014, the claims administrator mailed postcard notices to 562,394 class members summarizing the allegations of wrongdoing and the settlement. Of those, 18,988 postcard notices were returned as undeliverable without a forwarding address. The postcard notified recipients that they could be settlement class members if they had a telephone conversation with Wells Fargo during the relevant period in connection with the bank's servicing of real estate secured loans. The postcard further informed them that Wells Fargo had agreed to pay $5.6 million into a settlement fund, which would be used to pay the claims of class members after deducting incentive awards to the named plaintiffs, administrative expenses, and attorney fees. The postcard stated they had until June 12, 2014, to file a claim, exclude themselves from the settlement class, or object to the settlement. It also apprised them of the date and time the court would conduct the fairness hearing and of their right to appear at the

hearing.  Finally, the notice directed them to a settlement website or a toll free telephone number for further details of the settlement and to file a claim.  Class members could request a long form notice and claim form by calling the toll free number, or they could simply access those documents online at the settlement website.

Among other things, the long form notice on the website detailed how the parties had allocated the gross settlement fund between the two time periods at issue and the precise amount class counsel would seek for fees and costs ($1,916,667).  The long form notice informed class members:  "If you want to participate in the settlement, you must submit a Proof of Claim form online at **www.mountwfbanksettlement.com**."

The claims administrator received 23,772 valid claim forms.  This represented a claims rate of approximately 4.23 percent.  The claims administrator received only 45 requests for exclusion from the settlement class.

Five class members submitted objections, including Collins, Phillips, and Kron.  Collins and Phillips submitted a joint objection.  They objected to the use of the opt-in claims process, the "uncertainty" of the average recovery per class member, the "excessive" incentive awards for the Mounts, and the "unreasonably high" class counsel fees.  As pertinent here, Kron objected on the ground that class members could submit claim forms only online and not via mail, fax, e-mail, or phone.  He also objected to the attorney fees as unreasonable.

Plaintiffs filed their motion for final approval of the settlement in July 2014.  At the same time, the Mounts and Hoffman moved for their respective counsel's fees and costs.  The court held the fairness hearing on August 13, 2014.  Collins and Phillips appeared through counsel and voiced their objections.

The court entered a final approval order overruling all objections to the settlement except the objection to the Mounts' incentive awards—it reduced their awards from $25,000 each to $10,000 each.  The court otherwise approved the terms of the settlement discussed above as fair, adequate, and reasonable.  It awarded $1,634,000 in attorney fees and $86,047.04 in costs to the Mounts' counsel, and

6

$196,204.96 in attorney fees and $415 in costs to Hoffman's counsel. The Mounts' fees represented a lodestar multiplier of 2.04, while Hoffman's fees represented a lodestar multiplier of 1.15. Lastly, the court awarded the claims administrator fees and costs of $281,000.

After deducting the pertinent fees, costs, and awards, the final approval order noted that $3,347,333 was available for distribution to the claimants. With 23,772 claimants, this translated into an average settlement share of $140.81 per claimant. The court noted that this calculation was based on incentive awards to the Mounts of $25,000 each, and the actual average settlement share would be higher due to its reduction of the incentive awards.[2]

The court entered judgment consistent with its final approval order in October 2014. Collins and Phillips filed a timely notice of appeal, and Kron filed a timely notice of "cross-appeal."

## STANDARD OF REVIEW

The settlement of a class action requires trial court approval, and in approving the settlement, the court must determine that the settlement is fair, adequate, and reasonable. (*Dunk v. Ford Motor Co.* (1996) 48 Cal.App.4th 1794, 1801.) "The trial court has broad discretion to determine whether the settlement is fair. [Citation.] It should consider relevant factors, such as the strength of plaintiffs' case, the risk, expense, complexity and likely duration of further litigation, the risk of maintaining class action status through trial, the amount offered in settlement, the extent of discovery completed and the stage of the proceedings, the experience and views of counsel, the presence of a governmental participant, and the reaction of the class members to the proposed settlement." (*Ibid.*)

---

[2]    According to our calculation, the reduction in the incentive awards resulted in $3,377,333 available for distribution to the claimants. After the fairness hearing, the parties stipulated to accept the claims of two more claimants. Thus, the average settlement share per claimant was approximately $142.06.

7

We do not determine in the first instance whether the settlement was fair and reasonable, but only review the trial court's approval of the settlement for abuse of discretion. (*7-Eleven Owners for Fair Franchising v. Southland Corp.* (2000) 85 Cal.App.4th 1135, 1145.) We accord great weight to the trial court's views. (*Ibid.*) "To merit reversal, both an abuse of discretion by the trial court must be 'clear' and the demonstration of it on appeal 'strong.'" (*Id.* at p. 1146.)

Along the same lines, "[o]ur review of the amount of attorney fees awarded is deferential. [Citation.] Because the 'experienced trial judge is the best judge of the value of professional services rendered in his court,' we will not disturb the trial court's decision unless convinced that it is clearly wrong, meaning that it is an abuse of discretion." (*In re Vitamin Cases* (2003) 110 Cal.App.4th 1041, 1051-1052.)

## DISCUSSION

The objectors argue we should reverse the order of final approval because (1) the class did not have sufficient opportunity to review and object to class counsel's fee motions; (2) the opt-in claims procedure was unnecessary and discouraged claims; (3) the court failed to provide ways to submit claims other than online; (4) the settlement agreement released UCL claims not alleged in the action; and (5) the court awarded unreasonable attorney fees. We consider each argument in turn.

### 1. *The court did not shield class counsel's fee requests from scrutiny*

Class members had to submit their claims, exclusions, or objections by June 12, 2014. The court approved a schedule that allowed class counsel to file their fee motions after the deadline for responses. Counsel had to file the fee motions on or before July 22, 2014, approximately three weeks before the final fairness hearing on August 13, 2014. The objectors contend this schedule shielded class counsel's fee requests from scrutiny by the class, violated due process, and constituted a breach of fiduciary duty. We find no abuse of discretion in the court's approval of this schedule.

California Rules of Court, rule 3.769 governs class action settlements. The rule mandates that any agreement on attorney fees must be set forth in any application for approval of the class action settlement. (Cal. Rules of Court, rule 3.769(b).) The

8

parties in this case complied with this requirement. The motion for preliminary approval explained that the parties had agreed to $1,916,667 in class counsel's attorney fees and costs, which would be deducted from the gross settlement fund. The motion for final approval described again the total amount class counsel would seek in fees and costs, and it also explained that counsel for the Mounts was concurrently moving for fees and costs from the portion of the settlement fund calculated to compensate class members with claims factually similar to the Mounts ($5 million), while counsel for Hoffman was concurrently moving for fees and costs from the share of the fund that was to compensate class members with claims factually similar to Hoffman ($600,000).

California Rules of Court, rule 3.769 also directs what should be in the notice to class members. "The notice must contain an explanation of the proposed settlement and procedures for class members to follow in filing written objections to it and in arranging to appear at the settlement hearing and state any objections to the proposed settlement." (Cal. Rules of Court, rule 3.769(f).) Again, the parties complied with these requirements in the postcard and long form notice. And even though the rule does not specifically state that notice to class members must contain details about attorney fees, the notices contained such details. The postcard notice stated that attorney fees would come out of the $5.6 million settlement fund, and the long form notice advised that class counsel would seek $1,916,667 in fees and costs from the settlement fund.

Moreover, the notices advised them of the date and time of the final fairness hearing, that they could appear and the judge would hear them, and that the judge would decide exactly how much to pay class counsel at this hearing. The notices also apprised them of the Web site for the settlement, where they could find more information about the settlement agreement and litigation, and the case number and address of the court courthouse, where they could find all the documents in the litigation for their inspection.

Given all this information transmitted to the class members, we can hardly say the schedule shielded class counsel's fee requests from scrutiny or violated class members' due process rights. "The primary purpose of procedural due process is to provide affected parties with the right to be heard at a meaningful time and in a meaningful manner. [Citation.] It does not guarantee any particular procedure but is rather an 'elusive concept,' requiring only '"notice reasonably calculated to apprise interested parties of the pendency of the action affecting their property interest and an opportunity to present their objections."'" (*In re Vitamin Cases* (2003) 107 Cal.App.4th 820, 829.) Class members knew how much class counsel was seeking, how this compared to the total settlement fund, and how to register objections, whether that be an objection to the amount of fees or an objection to the amount of information available about the fee requests. Even if counsel filed the fee motions after the deadline for class member responses, class members could appear at the final fairness hearing and register complaints about the fee motions. The notices gave them all the information necessary both to obtain the fee motions and appear at the hearing. What is more, the court evinced a willingness to accept late responses. Of the 23,772 claims, 1,732 were late claims that the court exercised its discretion to accept. There is no reason to believe the court would refuse to consider late-filed objections or refuse to hear class members' objections at the final fairness hearing. The schedule adopted by the trial court did not violate due process or abuse its discretion.

The authorities on which the objectors rely may be meaningfully distinguished. They quote from a Ninth Circuit case, *Allen v. Bedolla* (9th Cir. 2015) 787 F.3d 1218, which cites and relies on another Ninth Circuit case, *In re Mercury Interactive Corp. Securities Litigation* (9th Cir. 2010) 618 F.3d 988 (*Mercury Interactive*). *Mercury Interactive* examined the requirements for class counsel's fee motion under rule 23 of the Federal Rules of Civil Procedure (28 U.S.C.) (federal rule 23). (*Mercury Interactive, supra*, 618 F.3d at p. 993.) Federal rule 23 expressly requires that class counsel direct notice of the fee motion "to class members in a reasonable manner" and provides that a class member may object to the motion. (Federal rule 23(h)(1);

10

*Mercury Interactive, supra*, at p. 993.) The court held that the plain text of federal rule 23 "requires a district court to set the deadline for objections to counsel's fee request on a date *after* the motion and documents supporting it have been filed," and "a schedule that requires objections to be filed before the fee motion itself is filed denies the class the full and fair opportunity to examine and oppose the motion that Rule 23(h) contemplates." (*Mercury Interactive, supra*, at pp. 993, 995, italics added.)

In general, federal rule 23 does not control class actions in California state courts. ". . . California courts are not bound by the federal rules of procedure but may look to them and to the federal cases interpreting them for guidance *or where California precedent is lacking*. [Citations.] California courts have never adopted Rule 23 as 'a procedural strait jacket. To the contrary, trial courts [are] urged to exercise pragmatism and flexibility in dealing with class actions.'" (*Wershba v. Apple Computer, Inc.* (2001) 91 Cal.App.4th 224, 239-240 (*Wershba*), italics added.) California does not lack for authority here. California has adopted a series of court rules specifically governing class actions (Cal. Rules of Court, rules 3.760-3.771), of which rule 3.769, discussed above, is a part. (*Los Angeles Gay & Lesbian Center v. Superior Court* (2011) 194 Cal.App.4th 288, 301 & fn. 6.) Rule 3.769 of the California Rules of Court discusses attorney fees and notice to class members, but contains no provisions analogous to those in federal rule 23 requiring class counsel's fee motions to be filed before the deadline for objections. The objectors' reliance on distinguishable federal authorities fails to persuade.

*2. The court's approval of the claims submission procedure did not abuse its discretion*

The objectors next contend the court abused its discretion in requiring settlement class members to submit claim forms to receive payment, instead of simply "cut[ting] a check" to all settlement class members who received notices. They also argue the court abused its discretion because it did not approve methods of submitting claims other than online. They assert such a procedure was unfair because not all class members had the ability to submit claims online. We reject both arguments.

11

### a. Requiring Class Members to Submit Claim Forms

The objectors assert the claim form process was unnecessary and only served to discourage claims. First, the trial court refused to infer an intent to discourage claims, finding that the settlement was nonreversionary. We agree with this reasoning. Wells Fargo agreed to a gross settlement fund of $5.6 million, and regardless of how many class members submitted claims, none of that money would revert to the bank. All the money available after deducting fees, expenses, and incentive awards would go to class members, and the residue of uncashed checks would go to *cy près* award recipients. The objectors have not explained what incentive Wells Fargo had to discourage class members from making claims. (See *Schulte v. Fifth Third Bank* (N.D.Ill. 2011) 805 F.Supp.2d 560, 593 (*Schulte*) ["[T]here is nothing inherently suspect about requiring class members to submit claim forms in order to receive payment [citations], especially in a common fund case like this, where the defendant's payout is capped regardless of the take rate."].)

Second, approving the claim form process—as opposed to an automatic payout to all settlement class members identified—did not constitute an abuse of discretion. According to the settlement agreement, Wells Fargo would identify settlement class members by conducting a reasonably diligent investigation of its records to identify all California residents who had one or more telephone calls with Wells Fargo during the class period in connection with the servicing of their real estate secured loans. These were the people who would receive notice. The claim form asked class members, under penalty of perjury, to certify that they held a real estate secured loan with the bank, to list the account numbers for the loans, to state whether they had "a telephone conversation" in connection with the loans with a Wells Fargo representative during the relevant period, and to provide the number of the telephone line they used during these calls. The form additionally asked for their names and addresses.

The objectors reason that the claim form was superfluous because it asked class members to supply information Wells Fargo already possessed, and the form was not necessary to calculate damages because each class member would simply receive a pro

12

rata share of the fund. They rely on another federal case in support of their argument, *Rubio-Delgado v. Aerotek, Inc.* (N.D.Cal., June 10, 2015, 13-CV-03105-SC) 2015 WL 3623627 (*Rubio-Delgado*). *Rubio-Delgado* is factually dissimilar. At the outset, the court noted that "[t]here is nothing inherently objectionable about requiring a claim form. However, where requiring a claim form imposes unnecessary costs or limits the number of class members who will receive a settlement, some justification is required before the Court will grant preliminary approval." (*Id*. at p. *5.) The court found the claim form both imposed unnecessary costs and limited the number of class members recovering without justification. (*Id.* at pp. *5-*6.) The claim form increased costs because the claims administrator would have to produce, process, and purchase prepaid return postage for 588,000 hard copy forms. (*Id.* at p. *5.) Further, the defendant could readily identify class members and their share of the settlement fund from its records, and the parties' justifications for the claim form were unconvincing. (*Id*. at pp. *5-*6.)

Here, in contrast, the online claim form carried significantly lower administrative costs by eliminating the need to produce paper forms and prepaid return postage. Additionally, the record discloses some justification for the claim form, unlike in *Rubio-Delgado*. At the final fairness hearing, counsel for Wells Fargo argued that an automatic payment to all settlement class members identified by its records of calls "would be overcompensating large numbers of people." This was because Wells Fargo's evidence showed substantial weaknesses in plaintiffs' case. The call-recording system did not actually record a significant number of calls during the class period because of technical malfunctions. Even when the system successfully recorded calls, inbound callers received an automated message that calls might be monitored, and Wells Fargo trained its representatives to provide a recording disclaimer when making outbound calls to borrowers. Thus, Wells Fargo argued, the vast majority of the settlement class members did not have causes of action for calls allegedly recorded surreptitiously and without consent; either the bank did not record their calls, or the class members had notice of the recording and consented to it. Wells

13

Fargo asserted that, given these defenses and the risks of overcompensating, it viewed the claim form as a way for class members who reasonably believed they were aggrieved—that is, believed they never received a disclaimer—to make claims. These were the people more likely to have a valid cause of action because they would have been uninformed of any recording. This was the context in which Wells Fargo approached the settlement. Although the claim form did not ask class members whether they had received a disclaimer, the postcard and long form notices informed them that the suit accused Wells Fargo of recording their calls without providing notice of the recording. The class members would therefore have this information when deciding to submit claims.[3]

Despite the objectors' reliance on *Rubio-Delgado*, the case did not discuss such a justification for claim forms. Nor did the case discuss the strength of the plaintiffs' case, the defenses on the merits, and the relative possibility that compensation would go to class members with significant weaknesses in their case. (*Rubio-Delgado, supra*, 2015 WL 3623627 at p. *9.) The court did analyze the fairness of the settlement in those terms here.

This case more squarely aligns with other federal cases that have found similar justifications for a claim form appropriate. For instance, in *Schulte, supra*, 805 F.Supp.2d 560, 565, the class action complaint alleged the defendant bank improperly assessed overdraft fees by posting customers' transactions in a high-to-low order rather than in strict chronological order. This so called "re-sequencing" allegedly

---

[3]    Wells Fargo's evidence suggested it would not be practicable for the bank to determine itself whether each borrower heard the disclaimer. There apparently was no automated way to determine this. Assuming the calls had been recorded, someone would have to listen to each call to make this determination. With the large number of settlement class members, the cost of searching for these recordings and providing the manpower to listen to them likely would be monumental, would take away from the overall fund available to the class members, and would thus not be in their best interests.

14

resulted in a higher number of overdraft fees than would have resulted had the transactions posted chronologically. (*Ibid.*) The court addressed objections from class members that a claim form was unnecessary because the bank knew or could ascertain which class members had incurred overdraft fees as the result of re-sequencing. (*Id.* at p. 593.) The court had information "that certain customers intentionally overdrafted their accounts, using the overdraft as an 'easy loan program.'" (*Id.* at p. 594.) The court held the claim form was "not completely superfluous" because, among other reasons, "[t]he option to file (or to not file) a claim gives customers who were aware of and assented to Defendant's re-sequencing policies the ability to opt out of receiving a payment that they feel they do not deserve." (*Id.* at pp. 593-594.)

*Lonardo v. Travelers Indemnity Co.* (N.D.Ohio 2010) 706 F.Supp.2d 766 is to similar effect. In that fraud case, "[t]he Plaintiffs allege[d] that the Defendant insurance companies sold consumers one homeowners insurance policy while unlawfully concealing the availability of a lower-priced policy that provided identical coverage and service." (*Id.* at pp. 770-771, 773.) An objector argued that the claim form erected an artificial barrier to recovery because "it does not provide [the defendants] with any information they do not already have." (*Id.* at p. 784.) The court rejected this argument, noting that the defendants insisted on the claim form as a way "to force Settlement Class Members to affirm that they would have purchased a lower-priced policy had it been offered to them." (*Ibid.*)

In short, a claim form process is not inherently suspect, and the record evinces some justification for it. The objectors have failed to convince us the trial court abused its discretion in approving the claim form process.

**b. Online Claims Submission**

Over 23,000 class members had no issue submitting claim forms online, representing a claims rate of approximately 4.23 percent. This claims rate was higher than the 1 to 2 percent predicted by lead class counsel, Paul Kiesel, based on his experience in other, similar privacy class action settlements. The objectors' assert that not all settlement class members had the ability to submit online claims.

15

To begin with, there is no evidence that a class member wanted to submit a claim but could not because he or she lacked access to the Internet. The objectors' briefing cites to 2013 United States census statistics available online that purportedly show "just 80.5 percent of Californians live in a household with high-speed internet use." Assuming for purposes of argument that this statistic is accurate, it does not demonstrate the online process failed to protect the interests of absent class members. The statistic says nothing about how many Californians had access to non-high-speed Internet at home, how many could access the Internet for free at a public place such as a public library, how many could access the Internet through smart phone technology, or how many could access the Internet at the home of a friend or family member. More importantly, this United States census data was not evidence before the court when it considered approval of the settlement. We will not rely on material outside the record. (*Knapp v. City of Newport Beach* (1960) 186 Cal.App.2d 669, 679 ["Statements of alleged fact in the briefs on appeal which are not contained in the record and were never called to the attention of the trial court will be disregarded by this court on appeal."].) But perhaps most importantly, no objectors stated they wanted to submit claims but could not because they lacked Internet access.[4] The process did not require objectors to submit their objections online. Rather, they submitted objections by filing a letter or written statement with the court and mailing it to counsel for the parties. They could find the instructions for submitting objections in the long form notice, which was available online *or* by calling the toll free number listed on the mailed postcard notice. They alternatively could have appeared at the final fairness hearing and voiced their objection to the online process. Accordingly, even objectors who lacked Internet access could have notified the court of their predicament, but none did.

---

[4] Kron registered a general objection that "[p]roof of Claims forms cannot be submitted via mail, fax, e-mail or phone," but he did not say that he personally lacked Internet access or could not submit a claim form online.

16

Furthermore, though the long form notice stated class members had to submit their claim forms online, it is not at all clear the parties would have rejected a paper claim form. Class members could request a copy of the claim form from the claims administrator by calling the toll-free number. If they could request a copy of the claim form this way, it stands to reason they could fill it out and mail it back the same way. Again, there is no evidence a class member tried to submit a claim form this way and was refused.

Lastly, the authority the objectors cite for their position, *In re NASDAQ Market-Makers Antitrust Litigation* (S.D.N.Y., Jan. 18, 2000, 94 CIV. 3996 RWS) 2000 WL 37992 (*NASDAQ Market-Makers*), does not support their concerns. In *NASDAQ Market-Makers*, the plan of distribution permitted three methods for settlement class members to make claims—a "traditional" claim form, a preprinted claim form, and an "electronic" claim form. (*Id.* at p. *1.) This opinion from the year 2000 described the preprinted form and the electronic form as "innovations" that were "likely to substantially increase the participation in the settlement by Class members over what would normally be anticipated." (*Ibid.*; see *id.* at p. *5 ["[T]he innovative use of preprinted and electronic claim forms is likely to contribute to a far larger number of claims . . . ."].) Thus, far from disparaging the use of an online form, the court praised it as an advancement that would increase claim submissions. The court also approved a slight change to the plan that pertained to class members who were required to file electronic claim forms because of the large number of transactions on which their claims were based. (*Id.* at p. *3.) The change allowed these class members to file a traditional claim form if they certified that they were unable to file an electronic one. (*Ibid.*) This aspect of *NASDAQ Market-Makers* does not persuade us the trial court abused its discretion here, when no evidence exists that even one class member desiring to submit a claim could not for lack of Internet access, and there is reason to think the parties would have rejected a paper claim form.

17

### 3.  *The objectors forfeited their argument regarding release of UCL claims, but even had they not, the court did not err*

The objectors further contend the court abused its discretion by approving a release of UCL claims because plaintiffs did not allege or pursue such claims in the action, thereby rendering the settlement unfair, inadequate, or unreasonable.  We reject this argument as well.

As a threshold matter, the objectors did not raise this issue below and thus forfeited it.  The trial court exercises its discretion when considering the fairness of a settlement.  To the extent objectors raise an entirely new theory on appeal, not considered by the lower court, we may decline to entertain such a theory for the first time on appeal.  (*Wershba, supra*, 91 Cal.App.4th at p. 237.)  The objectors assert they objected generally to the purported unfairness of the settlement and noted that it "broadly releases" a multitude of claims, and this general objection was sufficient to encompass the specific objection to the release of UCL claims.  We disagree.  Had the objectors raised their dissatisfaction with the release of UCL claims in particular, the parties could have addressed why the release of such claims was appropriate and the court could have considered the issue.  (See *Chavez v. Netflix, Inc.* (2008) 162 Cal.App.4th 43, 59 [argument not encompassed by objections below was waived; had objector timely raised it, the parties could have responded by modifying the settlement procedure "or creating a record of their reasons for not wanting to do so"].)

In any event, the objectors' argument is not persuasive on the merits.  To review, the settlement agreement released all claims against Wells Fargo arising during the class period that were or could have been alleged in the Mount and Hoffman actions, including without limitation UCL claims "to the extent they involve claims based on the recording of telephone conversations which took place in connection with the servicing of real estate-secured loans by Wells Fargo that were recorded, eavesdropped upon, wiretapped, or monitored by Wells Fargo."  The notice to settlement class members informed them in detail what claims the settlement agreement released, including the UCL claims, and they had access to the settlement

18

agreement itself. The court had this information as well when it granted preliminary and final approval.

While the operative complaint in the Mount action did not allege a UCL claim based on Wells Fargo's alleged surreptitious recording of calls, the Hoffman action did allege such a claim, and Hoffman ultimately dismissed his action without prejudice to join the Mounts in their action. The parties set forth this history in the settlement agreement, which also stated that it was settling claims alleged in *both* the Mount and Hoffman actions. Hoffman had his own class counsel in the actions and negotiations of settlement, apart from the Mounts' class counsel.

"A general release—covering 'all claims' that were or could have been raised in the suit—is not uncommon in class action settlements." (*Villacres v. ABM Industries Inc.* (2010) 189 Cal.App.4th 562, 588.) When the settling parties notify class members of the claims they are releasing before they must decide whether to opt out, "'[t]he weight of authority establishes that . . . a court may release not only those claims alleged in the complaint and before the court, but also claims which "*could have been* alleged by reason of or in connection with any matter or fact set forth or referred to in" the complaint.'" (*Id.* at p. 586.) Plainly, a UCL claim based on Wells Fargo's alleged conduct could have been alleged, because Hoffman did so at one point.

The objectors rely heavily on one case to argue the UCL release represented an abuse of discretion, *Trotsky v. Los Angeles Fed. Sav. & Loan Assn.* (1975) 48 Cal.App.3d 134 (*Trotsky*). They misplace their reliance on this case. *Trotsky* does *not* stand for a bright-line rule that a class action settlement may release only those claims alleged in the complaint. Moreover, the case involved notably distinguishable circumstances.

In *Trotsky*, the appellate court reversed a judgment approving a class action settlement because the settlement encompassed a class claim neither shared by the named plaintiffs nor asserted in the operative complaint. (*Trotsky, supra*, 48 Cal.App.3d at pp. 145, 153-154.) The apparent purpose of including the claim in the settlement was to foreclose another pending class action that alleged the same claim.

19

(*Id.* at p. 149.) The settling parties did not disclose the pendency of the second class action to the trial court when seeking preliminary approval, and the notice to settlement class members did not disclose the second pending action either. (*Id.* at pp. 143, 149.) The second pending action only came to light because the plaintiff in that action, Barwig, was a member of the *Trotsky* settlement class, and having received notice of the settlement, he entered an objection stating the *Trotsky* settlement should not bind him or the class members in his action. (*Id.* at pp. 143, 149.) The appellate court concluded the settlement could not include the claim because the named plaintiffs were not adequate class representatives for it. The claim was based on an allegedly invalid contract provision in the trust deed between the named plaintiffs and the defendant bank. (*Id.* at p. 139.) There was evidence the defendant bank never exercised the provision against the named plaintiffs, and so they had not personally suffered any monetary damage as a result of the provision. (*Id.* at p. 147.) The appellate court was also seriously concerned about the lack of "candor and openness" because the trial court had preliminarily approved the settlement without full knowledge of the facts, and the settlement class had no knowledge of Barwig's pending action. (*Id.* at pp. 149-150.) The court felt the settlement class members should have been able to decide whether to opt out because Barwig could better represent their interests. Or, the trial court could have consolidated the two actions and resolved them together, in which case Barwig and his counsel would have played a role in negotiating the settlement. (*Id.* at pp. 151-152.) It was in this context that the court stated: "Any attempt to include in a class settlement terms which are outside the scope of the operative complaint should be closely scrutinized by the trial court to determine if the plaintiff genuinely contests those issues and adequately represents the class." (*Id.* at p. 148.) The objectors place great weight on this statement.

But this case is completely different. There is no evidence of another pending class action asserting claims released by this settlement agreement, much less one that the parties concealed from the trial court or settlement class members. If anything, this case answers the concerns raised by *Trotsky*. The court was well aware of the

20

Hoffman action, which was no longer pending, before it preliminarily approved the settlement. Unlike Barwig in *Trotsky*, Hoffman voluntarily dismissed his action and joined the Mounts with his separate counsel. The objectors have not demonstrated why Hoffman is an inadequate class representative of UCL claims. Nor, for that matter, have they demonstrated why the Mounts are inadequate representatives of a UCL claim based on the same alleged conduct that underlies their other claims (violation of the Privacy Act, common law invasion of privacy, and negligence). The trial court did not abuse its discretion in approving the release of UCL claims. The objectors' misplaced reliance on *Trotsky* fails to convince us otherwise.

### 4. *The court did not abuse its discretion in determining the amount of attorney fees*

Finally, the objectors contend the court abused its discretion in the amount of attorney fees awarded. They maintain the court did not provide detailed reasoning analyzing the lodestar amount, allowed the attorneys "to claim outrageous and unsupported hourly rates," and unreasonably applied a multiplier. The objectors, however, fail to show an abuse of discretion.

The court here used the lodestar approach to award attorney fees. Under this approach, the court calculates the lodestar by multiplying the reasonable hours expended by a reasonable hourly rate. (*Wershba, supra*, 91 Cal.App.4th at p. 254.) "The court may then enhance the lodestar with a multiplier, if appropriate." (*Ibid.*) That is, once the court determines the lodestar, "it may increase or decrease that amount by applying a positive or negative 'multiplier' to take into account a variety of other factors, including the quality of the representation, the novelty and complexity of the issues, the results obtained, and the contingent risk presented." (*Lealao v. Beneficial California, Inc.* (2000) 82 Cal.App.4th 19, 26.)

Excluding costs, the court awarded fees of $1,634,000 to the Mounts' attorneys for their approximately six years of work on the case, and $196,204.96 to Hoffman's attorneys for their approximately two years of work on the case. For the Mounts' counsel, this represented a lodestar amount of $801,544.75 and a multiplier of approximately 2.04. For Hoffman's counsel, this represented a lodestar amount of

$170,268 and a multiplier of approximately 1.15. The court's order summarized the hours expended and hourly rates of each firm. The Mounts' counsel expended a total of 1,531.87 hours at rates ranging from $300 per hour to $1,100 per hour for the top partner. Hoffman's counsel expended a total of 319.6 hours at rates ranging from $350 per hour to $595 per hour.

Counsel filed attorney declarations attesting to their work in this case, their experience in similar class actions, and the reasonableness of the rates charged. The declarations also attached detailed billing records for the work. The court's final approval order held that, based on a review of counsel's billing records, the hours spent appeared to be reasonable for the six-year-old case, and the hourly rates charged appeared to be reasonable and in line with prevailing rates in the community.

The court further held that the "medium difficulty" of the case, the quality of the representation, the good results obtained for the class, and the contingent risk presented by the case justified the application of modest multipliers to the lodestars. The court also noted that, if one "cross-checked" the fee awards against the settlement fund, they represented approximately 32.7 percent of the common fund, which was slightly below the average award in class actions of one-third (33.3 percent) the total recovery.

As we noted above, the trial court represents the best judge of the value of professional services rendered in the trial court, and we will not upset the award of fees absent a clear abuse of discretion. "[W]e infer all findings in favor of the prevailing parties." (*Wershba, supra*, 91 Cal.App.4th at p. 254.) We presume the award of fees is reasonable, and the objectors carry the burden of affirmatively showing error in the award. (*Consumer Privacy Cases* (2009) 175 Cal.App.4th 545, 556.)

Here, the objectors' contention that the court erred because it did not set forth more detailed findings on the lodestar amount is not well taken. The record is clear that the parties briefed the applicable legal principles (determination of hours reasonably expended multiplied by reasonable hourly rate) and these principles guided

22

the court in its exercise of discretion. No more was required. (*Wershba, supra*, 91 Cal.App.4th at p. 254 ["No specific findings reflecting the court's calculations were required."].) Beyond conclusory assertions that the hours expended were unreasonable, the objectors point to only one billing entry that they believe was unjustified: an entry from Hoffman's counsel showing one-half hour spent discussing "OSC re lack of prosecution" in Hoffman's district court case. The objectors do not explain why the court should have disallowed fees for this time, and the record reveals reasons why such time may have been justified. That is, the records show Hoffman's counsel had not been idle but had been in settlement discussions for months prior to this. This would explain why counsel had not been prosecuting the district court case. Without any further discussion by the objectors of the purported inadequacy of the billing entries, we decline to consider the issue further. (*Center for Biological Diversity v. County of San Bernardino* (2010) 185 Cal.App.4th 866, 899.) "It is not our job to comb through the record in search of grounds to upset" the fee award. (*Ibid.*)

The objectors' argument that the hourly rates were unsupported also fails to persuade. In approving an hourly fee, the court may consider the fees ordinarily charged by that attorney and the rate prevailing in the same community for similar work. (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095; *Bihun v. AT&T Information Systems, Inc*. (1993) 13 Cal.App.4th 976, 997, disapproved on another ground by *Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 664.) The court may also consider the experience, skill, and reputation of the attorneys, and it may rely on its own knowledge of and familiarity with the legal market. (*Heritage Pacific Financial, LLC v. Monroy* (2013) 215 Cal.App.4th 972, 1009.) Here, there was sufficient evidence to support the court's approval of the hourly rates. The attorney declarations of the Mounts' counsel stated the hourly rates sought were the regular and current rates the attorneys charged for their services in noncontingent matters, and the rates had "been accepted and approved in other class action litigation." They further attested that the rates were "commensurate with the

23

prevailing market rates for attorneys of comparable experience and skill handling complex litigation." The attorneys also submitted résumés of their firms showing their extensive experience representing named plaintiffs in class actions suits and the biographical information for the attorneys. Hoffman's attorneys' declarations attested that the rates sought were similar to what courts had recently approved for their work in other class actions, and they compared those rates to similar rates sought by California law firms in 2007 (when market rates would have been lower). They, too, submitted evidence of experience in prosecuting numerous consumer rights class actions.

Moreover, the objectors have not persuaded us the court abused its discretion in applying multipliers to the lodestar. The court used multipliers of 2.04 and 1.15. "Multipliers can range from 2 to 4 or even higher." (*Wershba, supra*, 91 Cal.App.4th at p. 255.) Two factors in particular justified the multipliers—the contingent nature of the case and the results obtained.

"An enhancement of the lodestar amount to reflect the contingency risk is '[o]ne of the most common fee enhancers . . . .'" (*Bernardi v. County of Monterey* (2008) 167 Cal.App.4th 1379, 1399.) Our courts have explained the economic rationale for a fee enhancement in contingency cases as follows: "'A contingent fee must be higher than a fee for the same legal services paid as they are performed. The contingent fee compensates the lawyer not only for the legal services he renders but for the loan of those services. The implicit interest rate on such a loan is higher because the risk of default (the loss of the case, which cancels the debt of the client to the lawyer) is much higher than that of conventional loans.' [Citation.] 'A lawyer who both bears the risk of not being paid and provides legal services is not receiving the fair market value of his work if he is paid only for the second of these functions. If he is paid no more, competent counsel will be reluctant to accept fee award cases.'" (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132-1133.) The objectors have not explained why a contingency enhancement was unjustified in this case.

24

As to the results obtained, the objectors' conclusory assertion that the recovery for the class was inadequate makes little sense, when they never address or rebut the substantial weaknesses in the case that Wells Fargo's evidence revealed. Those weaknesses, which we have already discussed elsewhere, went to class certification *and* defenses on merits. Wells Fargo showed any recovery was uncertain, whether because individualized issues barred class certification, or because of strong defenses on the merits. In light of these circumstances, we will not disturb the trial court's judgment that an enhancement was appropriate for obtaining a $5.6 million settlement fund when faced with such uncertainties and defenses.

## DISPOSITION

The judgment is affirmed. Respondents Wells Fargo, the Mounts, and Hoffman shall recover costs on appeal.

FLIER, J.

WE CONCUR:

BIGELOW, P. J.

JOHNSON, J.*

---

\* Associate Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

25